No. 48.—Montgomery Roberts, plaintiff in error, *vs.* The State of Georgia, defendant in error.

[1.] Where the presiding judge has refused a new trial, upon the ground of a finding contrary to evidence, this Court will interfere and grant a new trial only in cases that are *strong and unequivocal.*

[2.] A new trial will not be granted upon the ground of newly discovered evidence, unless due diligence has been used to procure it on trial. Nor will a new trial be granted if the newly discovered testimony is only cumulative.

[3.] If a man has reason sufficient to distinguish between right and wrong in relation to a particular act about to be committed, he is criminally responsible. An exception to this rule, however, is, where a man has reason sufficient to distinguish between right and wrong as to a particular act about to be committed, yet in consequence of *some delusion,* the will is overmastered and there is no criminal intent. Provided that the act itself is *connected with* the peculiar delusion under which the prisoner is labouring.

Roberts *vs.* The State of Georgia.

Indictment for an assault with intent to murder.    Tried before Judge FLOYD.    In Bibb Superior Court.    May Term, 1847.

The prisoner was convicted, and sentenced to four years' hard labour in the Penitentiary.

The defence set up on the trial, was mainly, the insanity of the prisoner at the time of the commission of the offence charged.

The bill of indictment alleged the assault to have been made upon one John Knight, in the county of Bibb, on the 18th day of May, 1847.

Mrs. Maria Julian, the first witness sworn for the State, testified, that she was in the school room, and heard the prisoner come into the house making very great noise, cursing and swearing.    Witness' mother tried to quiet him, and to get him to go into the kitchen; whereupon the prisoner being in great rage, and making a great noise, tried to strike her, and also attempted to strike witness.    She ran from him into the front porch, and he followed on after her, still attempting to strike her.    She ran back into the house, and her mother locked the front door, when prisoner began to beat upon the door, and swearing at the same time very loudly. They also locked the back door; prisoner getting to it, beat upon it and split it, but did not break the lock.    Witness then ran into her room, and raising the window, called Mr. Graybill.    Witness then saw prisoner standing in the kitchen door, with a gun in his hand; she was very much frightened, and put the window down. Prisoner was witness' cousin, and was intoxicated at the time; she had known him a long time, and had often seen him in sprees, and intoxicated; he was usually obedient to witness' mother when she spoke to him, before this instance.    Prisoner was a steady man when not intoxicated, and always behaved himself well when about her house, until recently; for the last two or three months, he had acted very strangely.    Prisoner had spoken very strangely, and in a very insinuating manner to her, and that his strange conduct and language to · her, was in reference to her refusal to marry him; about six or seven weeks before, he had asked her to marry him, which she refused.

By "prisoner's strange conduct," witness meant his perseverance after her refusal to marry him.    It was after her refusal to marry, that he spoke and acted so strangely towards her.

John Knight, in behalf of the State, testified, that he was at

Mrs. Julian's on the day of the difficulty.  It was eleven o'clock, A. M., when witness went to Mrs. Julian's.  He found the prisoner there with a gun in his hands.  Witness went to the door of the house, and prisoner told witness to go back, or he would shoot him.  Witness then returned, and prisoner came out of the kitchen. Prisoner then got over the fence, and witness followed him.  Witness was about twenty feet from the prisoner, when taking deliberate aim, he snapped the gun at witness.  Prisoner then took down the gun and cocked it again, and snapped it a second time at witness.  Prisoner then went to the fence, and set the gun down, when Mr. Graybill jerked up the gun as soon as prisoner put it down, and carried it into the house, and returned.

The prisoner then fell down beside the fence, and commenced crying and sobbing, as if crazy.  Witness made some remark to him, when he jumped up and kicked witness, and then fell down again.  The gun was loaded, &c.  Witness heard prisoner abusing Mrs. Julian and her mother.  Prisoner said, standing in the door, *Oh, you pale faced bitch, how dare you baffle my love thus far*; he also called them " whores."  The gun was shot off directly after the snapping at him.

James Sims, on the part of the State, testified, that he was present, saw prisoner snap the gun at Knight at the distance of about twenty feet.

Witness loaded the gun himself, before prisoner got hold of it, with powder and shot, which were between the size of bird and squirrel shot.

The testimony on the part of the State here closed.

Several witnesses were introduced in behalf of the prisoner to prove insanity, and others by the State, to rebut that proof.

Immediately preceding the difficulty, prisoner was furious, and appeared to be drunk ; he attempted to break into the house where one of the witnesses, Mrs. Julian was, and soon after got hold of a gun and attempted to shoot Knight.  For the two or three months previously he had acted strangely ; before then, he was steady when not intoxicated.  He had proposed marriage to Mrs. Julian, who was his cousin, which was rejected, and from that time his strange conduct commenced.

The witness Freeman, testified that the witness had worked for him and a Mr. Roberts, for the last year or two, and for the last six weeks he had worked in the same shop with witness, and witness thought his conduct very strange; about that time he wrote strange

letters to witness, and put them in his way. The first was in refer-
ence to *a lady*, whose name was not mentioned, requesting
witness to interfere in his behalf; the others were of the same
character; their contents were very disjointed; the last was writ-
ten about two weeks before the difficulty. All of them were
destroyed except the last. The conversation of prisoner while in
the shop was also very irregular; he would frequently break off
from the subject of conversation, and from his work, and com-
mence speaking of a lady. His conduct during that time was
altogether different from what it had been previously. On a certain
Wednesday during that time, his conduct was very strange. Wit-
ness asked prisoner for a tool which he called a " board iron ;" he
could not find it, but asked witness for a piece of white paper.
Witness gave him a half sheet of letter-paper, when prisoner
asked him for a sheet that was not ruled, which was furnished.
He then wrote upon the paper and put it into his hat, and informed
witness that he guessed the " board iron " was in the hat, and then
ran out of the shop. Witness upon looking into the hat saw
only the piece of paper. In about an hour the prisoner returned, and
seemed to desire witness to see the paper, and wrapped it around
witness' pen, and put it in the cash book. Witness examined the
paper, and the following were its contents, viz: " *S. Freeman ;
Gin ; Rum ; Whiskey ; Brandy. Mixed Liquors are the ruin of
any body, the only hope left, I have, is in suicide.*" Part of his name
was signed to it. Prisoner then left the shop, and afterwards
returned with a small phial, and something resembling a powder
wrapped in a small package. He poured the contents of the
phial into a tumbler, retired to the back part of the shop where he
remained a half hour, and then set the contents of the tumbler on
the fire, the heat of which broke the tumbler; he then got a wine-
glass and put the liquid in it, acting very strangely over it; and
finally he put the powders in and drank it. He then left the shop
and ran down the alley as before, and returned with a small pickle
jar in his hand, which appeared to contain whiskey; he had a cigar
in his mouth and a half plug of tobacco in his hand. Witness
asked him what he had in the jar, whereupon he threw it down and
broke it, and threw down his cigar also, exclaiming, " Death and
destruction to mean liquor and bad cigars !" Prisoner continued
to act thus strangely for the balance of the week, and on Saturday
witness discharged him, which was about ten days before the diffi-
culty. On the day before the difficulty, prisoner returned to

witness's shop, when witness asked him to sit down.   Prisoner spoke constantly in a kind of soliloquy about some love affair, complaining of the ladies' deceiving or disappointing him, and then speaking affectionately of them ; he then left the shop.   Prisoner acted in this strange and irregular manner when perfectly sober, though he might have drank when witness did not know it, but usually when he took a drink it threw him.   During the time prisoner acted thus strangely, what work he did was done as well as before.

Mr. Roberts testified, that he had noticed the conduct of the prisoner for the six weeks alluded to by the other witnesses, and that he had acted in a very strange and foolish manner.   Prisoner asked this witness what he thought people said of him, prisoner; witness replied, he did not know; prisoner then said that people said, that he, prisoner, was deranged, and asked witness what he thought; witness replied, that he acted very strangely, and must either have turned fool, or was drunk.   Prisoner said, he was not drunk, and to prove it, blowed his breath in witness's face.   If prisoner had been drunk, witness would have known it, as he could always tell when prisoner was drunk.   Prisoner said they (the people) did not look to him, as they used to, and he would tell witness what was the matter with him; he was just beginning to know something; he was not drinking then ; and he said he was not a fool, but just beginning to get some sense.   This occurred two or three weeks before the difficulty.   This witness testified to other strange conduct of the prisoner; such as that he appeared strangely; that he had written witness foolish notes.   Witness testified that the last work he had done for him, was done very well.

Mr. Jones testified, that prisoner's conduct while boarding at his house, a short time before the difficulty, was very strange; he would generally be up till 12 o'clock at night, and sometimes as late as two or three in the morning, writing, and walking his room, and tearing up his writing and talking to himself; his conduct was so strange, that witness asked him, aside, what was the matter with him ; when he replied, that he knew of nothing any more than he was getting his eyes open, that he had begun to learn sense.   Prisoner said that he had been sleeping a long time, that he had just waked up, and he was going to do better than he ever had done ; witness asked him how ? he replied, that he meant to become a religious man.   Witness then asked him how he felt in regard to religion ? he replied, that he felt first rate, and continued to feel

Roberts *vs.* The State of Georgia.

better. For two weeks before prisoner left witness' house he had a wild, strange look out of his eyes; his look was wild and ghastly. Prisoner had a much wilder look previous to the day of the difficulty, and on that day, than when witness was testifying. Witness did not think prisoner was drunk on the day of the difficulty. Witness saw him on the day of the difficulty, lying down by the fence, at the place where it occurred, crying.

Mr. Chesnut corroborated the foregoing witness, as to prisoner's conduct at the boarding house, in sitting up late and talking to himself; he could not understand what he said when talking to himself. Prisoner looked wildly out of his eyes, very differently from what he previously looked; he was not drunk when he acted so strangely. Saw prisoner on the morning of the difficulty, about three hours before it occurred, and did not think he had been drinking that morning.

Mr. Hughes, the jailor, testified that he saw prisoner before he was committed to jail; he was making great noise, and trying to raise a difficulty. On the morning after he was brought to jail, he said to witness, that it was not worth while to keep him there any longer, for he was then sober. When witness informed him what he was sent to jail for, he replied he knew nothing at all about it. When he was about to be carried before the magistrate, he acted very strangely, picked up a lock of hair which he said a girl he once loved had given him, that he did not love her then, and any body might have the hair. Afterwards, when witness went to prisoner's room, the third day after his commitment, he found him stripped of his clothes, with his blanket around him, and his boots on; he had broken his water bucket and chamber. Prisoner would come out of the room when witness' servants went to the jail, and witness would have to go up and make prisoner go back into the room. He had continued to act in that strange manner during the whole time he was in jail.

Mrs. Elizabeth Sims testified, that prisoner had boarded with her for four weeks previous to his commitment to jail; while at her house, he frequently at night kept three candles burning at one time, one in his bed room, one in the passage, and one in the room where she worked; she did not think he was drinking while at her house, nor on the morning of the difficulty. She thought he had a very vacant wild look, that morning.

Mr. Wingfield, testified to strange conduct of the prisoner, on the day of the difficulty, and before it took place; that on a Mr.

Tutt passing by prisoner, he jumped at him, in a wild, furious manner.

The rebutting witnesses, offered on the part of the State, proved that prisoner was drunk on the day of the difficulty; they judged so from having seen him drunk before. One of the witnesses saw him take two or three drinks in the course of five minutes, and thought he was then drunk; this was on the day of the difficulty, and before it occurred.

One of the rebutting witnesses, Brown, the magistrate, testified that the prisoner came to his bar and wanted liquor, when witness directed his bar-keeper not to let him have anything to drink; he was then drunk. About an hour afterwards he was brought before witness as a magistrate, for the offence charged in the indictment, and in consequence of his being drunk, witness sent him to jail until next morning; when he was brought before witness on the next day, he seemed cool and rational; the plea of insanity was then spoken of, but not urged. Witness had never heard of prisoner being insane before. Witness had known him for eight or ten years, and when drunk he was very foolish. In the morning before the difficulty, and afterwards on that day when brought before witness, the prisoner was drunk. Witness saw nothing more in prisoner than that he was drunk. Witness judged that he was drunk from his actions; never saw a crazy man act as prisoner did; if crazy he thought it was from liquor; he had seen prisoner drunk before, and he acted precisely as he did in that instance.

After the testimony was closed and the case argued by counsel, the judge charged the jury as follows:

"The great object of punishment by law is, to afford security to the community against crimes, by punishing those who violate the laws; and this object is accomplished by holding out' the fear of punishment as the certain consequence of such violation. Its effect is to present to the minds of those who are tempted to commit crime, in order to some present gratification, a strong counteracting motive, in the fear of punishment. But this object can only be accomplished when this motive operates upon an intelligent being, capable of remembering that the act about to be committed is wrong, contrary to duty, and such as in any well ordered society would subject the offender to punishment.

"To recur then to what has been already stated, in order that punishment may operate as an example to deter others from

Roberts *vs.* The State of Georgia.

committing criminal acts when under temptation to do so, by presenting a strong counteracting motive.

"The person tempted must have memory and intelligence to know that the act he is about to commit is wrong; to remember and understand, that if he commits the act he will be subject to punishment, and reason and will, to enable him to compare and choose between the supposed advantage or gratification to be obtained by the criminal act, and the immunity from punishment he will obtain by abstaining from it.

"A person therefore, in order to be punishable by law, or in order that his punishment by law may operate as an example to deter others from committing criminal acts under like circumstances, must have sufficient memory, intelligence, reason and will, to enable him to distinguish between right and wrong in regard to the particular act about to be done, to know and understand that it will be wrong, and that he will deserve punishment by committing it.

"In order to constitute a crime, a man must have intelligence and capacity enough to have a criminal intent and purpose; and if his mental powers are either so deficient that he has no will, no consent, or if through the overwhelming power of mental disease his intellectual power is for the time obliterated, he is not a responsible moral agent, and is not punishable for criminal acts.

"If, therefore, you believe from the testimony, that at the time of the committing of the act, the prisoner had memory and intelligence, even a glimmering of reason sufficient to enable him to distinguish between right and wrong in regard to the particular act about to be committed, to know and understand that it would be wrong, and that he would deserve punishment by committing it, you will find him guilty.

"If you believe from the testimony, that the prisoner on the morning of the day upon which the offence was charged to have been committed, was rational and knew the effect liquor would have upon him, and afterwards drank liquor, though the prisoner was insane at the time the offence was committed, yet it was a voluntary act of the prisoner, and you ought to find him guilty."

Upon which evidence and charge of the Court, the jury returned a verdict of guilty, recommending the prisoner to mercy, &c.

Before the jury had made up their verdict, Dillard, one of their body, when permitted by the Court to retire for a short time from the court room, was guilty of certain alleged misconduct, for the particulars of which, see 8th ground of motion for new trial.

The counsel for the prisoner then moved the Court below for a new trial, upon the following grounds :

1. That the jury found against the testimony.

2. That the jury found against the weight of the testimony.

3. That the jury found against the charge of the Court.

4. That the Court erred in charging the jury, that "if they believed from the testimony, there was a glimmering of intellect at the time of the commission of the offence charged, by which he could distinguish right from wrong as to the particular act about to be committed, they ought to find the prisoner guilty."

6. That the verdict was against law.

8. Because ———— Dillard, one of the jurors who tried the cause, when permitted by the Court to leave the court room with his fellow jurors, in the presence of a bailiff, and in his charge, in returning, a portion of the jurors returned into the court room before the others, when said Dillard lagged behind, and for a short time was out of the view of the bailiff, said Dillard not returning into the court room until one minute or one and a half minutes after his fellow jurors had returned.

9. Upon the ground of newly discovered testimony, as shown by the affidavit of Mrs. Elizabeth Sims, as follows :

"GEORGIA,    }    Personally appeared before me, James Smith, a *Bibb County :* }  Justice of the Inferior court in and for said county, Elizabeth Sims, who on oath saith, that on Tuesday morning, the 18th May last past, and before the commission of the offence charged to have been committed by Montgomery Roberts, this deponent had a conversation with said Roberts, a part of which conversation was detailed by deponent when she was examined as a witness on the trial of said cause, on Saturday last; witness intended to relate the whole conversation, but was stopped.

"Deponent saith, that the said conversation was in substance as follows. Said Roberts was perfectly cool in the morning when deponent spoke to him, and appeared perfectly rational; more than usually calm and quiet, with the exception of his looks; his countenance appeared to have a vacant stare.

"During the same conversation, deponent told said Roberts, that he (Roberts) had changed a gold piece, which he had said that he had lost, and not being able to satisfy said Roberts that he had changed the gold piece, he became furious and frantic, and deponent seriously apprehended that said Roberts would commit

Roberts *vs.* The State of Georgia.

personal violence on deponent. Said Roberts left the house of deponent in a great rage.

" Deponent never saw Roberts afterwards until after he returned to the house of deponent, and as soon as he saw deponent, he rushed upon deponent, and was about striking deponent, when a son of deponent interfered, and received the blow that was intended for deponent."                                                                 her

· ELIZABETH ⋈ SIMS.

mark.

*Subscribed and sworn to before me, this 1st June,* 1847.

JAMES SMITH, *J. I. C."*

The Court below, after argument, overruled the motion for new trial, and the grounds thereof, and proceeded to sentence the prisoner. To which decision and judgment, the counsel for the prisoner, excepted.

T. P. STUBBS, for the prisoner.

I am aware of the difficulty of obtaining a new trial, particularly in criminal cases, where the judge who tried the cause is satisfied with the verdict. The policy of the law is to discourage litigation.

This difficulty, and this policy, I have to contend against. I flatter myself that I will be able to present to the Court such a case in this record, and under the law as applicable to the case, as will justify me in asking for a new trial.

1. *As to the charge of the Court below.*

We respectfully contend, that the law as laid down by the Circuit Judge, is not the law of the case now before the Court. The charge, we contend, was calculated to mislead the jury, and work injustice to the prisoner, and that the true rule is not so stringent as that laid down, but is more in accordance with the principles of humanity, when a proper case is made. See the authorities collated in the case of *Abner Rogers.*

There must not be only a ' glimmering of intellect' to excuse the prisoner from criminal responsibility ; he must be a person of sound memory and discretion. *Hotchk.* 705. Would we say of the sun, he was shining, when his last glimmering ray was reflected on the eastern hills ; or of a candle, that it was burning brightly and performing its proper office, when glimmering in the socket ? All lunatics have a ' glimmering of intellect.' It is only in cases of confirmed idiocy, that we find the rays of intellect entirely excluded.

This charge of the Court, no doubt, controlled the jury in their finding; 'taking the meaning of the words used in this portion of the charge in their common acceptation, they felt bound to convict the prisoner, unless they could have believed, from the testimony, that he was a raving maniac, or a passive hopeless idiot.

I am well aware, that the burthen of proof of insanity was upon the prisoner, but not, as ruled in the old cases, to be made to appear beyond a doubt; but the prisoner must show a probable case.   See charge of the Court in the case of *Abner Rogers.*

We have in vain looked for any evidence in this case, going to show that the prisoner was sane on the morning the offence was committed.   But if the Court should be of opinion, that there was slight testimony to that fact, we respectfully contend that the rule is, that courts will grant a new trial, " where the verdict is manifestly against the weight of evidence, provided injustice seems to have been done by the verdict, and the cause is of sufficient value ;" although proof has been adduced *on the other side.    Corbett* vs. *Brown,* 8 *Bing.* 33 ; *Graham on New Trials,* 368.

If the verdict be plainly against evidence, or if in a case of great consequence, as this certainly is, to the unfortunate prisoner who now makes the appeal to your honours, where great doubt must exist as to the correctness of the conclusions drawn by the jury, it would seem right that the case should be more deliberately argued, and presented to the consideration of another jury.   1 *Wash. C. C. R.* 123.

It is the frequent practice of the courts to set aside verdicts where manifest injustice has been done, although some proof may have been adduced in support of them.    *Hutchinson* vs. *Coleman,* 5 *Halst. R.* 74 ; *Wallace* vs. *Frazer,* 2 *Nott & McCord R.* 516 ; *Johnson* vs. *Davenport,* 3 *J. J. Marshall R.* 391 ; *Graham on New Trials,* 370, 371, *upon the ground of newly discovered evidence.*

The witness was stopped, (as she says in her affidavit,) while intending to go on and relate the whole conversation.

This testimony discloses the important and material fact, that the prisoner was labouring under some disease of the mind on the morning of the difficulty, at a time when he must have been sober.   The conversation occurred early in the morning, he having lodged in the house of the witness, and she testifying that he was cool and sober, yet in a moment, without provocation even the slightest, became furious and frantic, and attempted to strike his old aunt, to whom he was indebted for every thing but his

being, and to whom he had at all times before been very obedient, and grateful for her care and kindness towards him.

There is no pretence that he was excited by ardent spirits at that time.

The testimony is new, material, and not cumulative. *Graham on new trials*, 490; *Gardner* vs. *Mitchell*, 6 *Pick. R.* 114.

*Malice.*

The testimony discloses the fact that there was no malice.

Mrs. Julian was his relative; he tenderly loved her, passionately, and aspired to her hand. After he got into the strange situation spoken of by the witnesses, he always treated her kindly and affectionately. When he returned to the house, without provocation he commenced an assault upon her. Her screams brought the neighbours to her assistance. Mr. Knight came to her rescue—a stranger to the prisoner, and was ordered by prisoner not to follow him, Knight advanced upon him, the caution was repeated, and Knight still advanced while prisoner was retreating; in this position, and under this state of facts, as shown by the testimony, the gun was snapped.

Would this have been murder, had the gun fired? I apprehend not. It would have been manslaughter. If so, the conviction was improper. I repeat, if the crime had been manslaughter had death ensued, the verdict was wrong and illegal.

Sol. Gen. McCune, for the State.

1. The principle established by all authorities is, that if the prisoner, at the time the deed is done, has sufficient reason to distinguish between right and wrong, he is responsible for his act. *Roscoe Cr. Ev.* 875; *Chitty Med. Juris.* 354; *Wharton Am. Crim. Law*, 10, 11, 12.

2. Whenever there is a separation of the jury after they are charged with a criminal case, the law presumes *prima facie* that nothing improper has been done. *The People* vs. *Douglass*, 4 *Cowen R.* 26; *The People* vs. *Ransom*, 1 *Wend. R.* 425; *The People* vs. *Bebee*, 5 *Hill R.* 32; *The State* vs. *Prescott*, 7 *N. Hamp. R.* 290; *The State* vs. *Babcock*, 1 *Conn. R.* 401; *The State* vs. *Miller*, 1 *Dev. & Batt. R.* 500; 1 *Hayw. R.* 258; *Myatt* vs. *The State*, 1 *Blackf. R.* 25; *The State* vs. *McKee*, 1 *Bailey R.* 651.

3. When motions for new trials are made on the ground of newly discovered testimony, it must be such that it could not have been

discovered and secured by due diligence at the former trial. *Wharton Am. Crim. Law* 659, 650.

It must be material in its object, and not merely cumulative, and corroborative, or collateral. *Pike* vs. *Evans*, 15 *Johns. R.* 210 ; *Wharton Am. Crim. Law* 661, 662.

It must be such as to produce on another trial, an opposite result on the merits. *ib.*

*By the Court.*—NISBET, J., delivering the opinion.

[1.]    This writ of error is founded on a refusal of the Court below to grant a new trial. The 1st and 2d grounds may be considered together. A new trial was asked by the prisoner, 1st, because the jury found a verdict contrary to the testimony, and 2d, because they found against the *weight* of the evidence. The first seems to assume that the evidence was all in favour of the prisoner, and needs only to be noticed so far as to say, that the record denies this very plainly. The assault was directly proven—the prisoner deliberately aiming and snapping a gun charged with powder and ball, twice, at Mr. Knight. It was also proven that he received no provocation ; and the evidence under the plea of insanity was somewhat conflicting. We can not say that the jury found against the testimony, nor do we think that the presiding judge ought to have said so. The second, admits that there was some evidence against the prisoner, but asserts that the weight of it was in his favour. Whether this was so or not, was a question for the jury to determine ; their verdict has negatived the idea that it was. It is their duty to weigh the testimony, to reconcile conflicting evidence, and to judge of the credibility of the witnesses. Not only so, but it is the right of the parties that they shall discharge these duties. The principles which regulate the granting of new trials, upon the ground of a finding contrary to evidence, are well settled. I shall not go into them upon this occasion, for this reason, that applications for new trials, are left to the discretion of the presiding judge. Even he will not, but in a case of manifest injustice, disturb the verdict of the jury. And when that court has exercised its discretion, and refused a new trial, this Court will not interfere and control that discretion, but in cases that are *strong and unequivocal.* This is not one of that kind. The presiding judge being an eye and ear witness of the trial, cognizant of all the circumstances attending it, observing the appearance of witnesses,

their attitudes, intonations of voice, consistency or contradictions, must be infinitely better qualified to judge of the propriety of granting a new trial, than we can be who see the case only as it appears upon the record. In *K. P. Boon* vs. *The State of Georgia*, this Court say, " It must be a very clear case of *error in law*, or a very naked, bald case, as to the *facts*, which will authorize this Court to control the discretion of the Court below, in a criminal 'cause, where the jury are made both the judges of the law and the facts." 1 *Kelly R.* 618.

The new trial was asked also upon the ground of newly- [2.] discovered testimony. The newly discovered testimony was that of Mrs. Sims, who was called and sworn, and testified on the trial in behalf of the prisoner. She was examined in relation to the conduct and habits of the prisoner during the time that he boarded at her house, (being about four weeks,) before he was sent to jail. She was called to support the plea of insanity. The *newly discovered testimony*, as appears by her affidavit, relates to the prisoner's appearance, sayings and conduct on the morning of the day when the offence was committed. The affidavit states that the prisoner in the morning, previous to the time when he snapped the gun at Knight, was at her house ; was calm and rational; that his countenance appeared to have a vacant stare ; that she spoke to him about a gold piece that he had changed, and which he said he had lost ; and not being able to satisfy him that he had changed it, he became furious and frantic; that he left the house, and when he returned, rushed upon her and was about striking her, when her son interfered and received the blow that was intended for her. From this recital two things are manifest :

1. That the prisoner might have had the benefit of this testimony on the trial, if any diligence had been used to get it. The witness was in court, was in communication with the prisoner's counsel, and was sworn in his behalf. *Further*, the witness in her affidavit states, that the newly discovered testimony, relates to a conversation which she held with the prisoner on the morning of the day upon which the assault was committed, a part of which conversation was detailed by her when she was examined on the trial, and that she intended to state the whole, but was stopped. Counsel therefore had, while the witness was on the stand, intimation, nay, warning, of what the witness could prove, in this, that she was examined on the trial, in relation to the same conversation about which new testimony is said to be discovered. She was

stopped—if by the Court, then, if in *that* there was error, the prisoner had his remedy—if by the prisoner's counsel, in *that event*, it' was his own wrong act, of which, he can not avail himself. To grant a new trial on the ground of newly discovered testimony, it must be shown that due diligence, was used to procure it. Here there was no diligence, and for that reason the new trial, as to this ground, was properly denied.

2. The new testimony was cumulative; it was to the same subject matter, to wit, the appearance, sayings and conduct of the prisoner, about which the witness had already testified; it relates to the same conversation to which her previous testimony related, and has reference to the same time. It was cumulative, and therefore the new trial was rightfully denied. *Wharton Am. Crim. Law* 662, 659, 660; 1 *Bayley R.* 263; *ib.* 491; 2 *id.* 267; 6 *Pick. R.* 114; 10 *id.* 16; 8 *Johns. R.* 84; 15 *id.* 210; 18 *id.* 489; *Peters C. C. R.* 69; 1 *Sumner C. C. R.* 482; 18 *Eng. C. L. R.* 335.

Another ground of error is, that the jury found contrary to the law. This ground is so general, that we should not have known in what it was charged to be contrary to law, but for the argument. Counsel take the position, that according to the testimony, the prisoner, if death had ensued, would have been guilty only of manslaughter, and therefore was not, according to the law of the case, guilty of an assault with intent to commit murder. We are very clear that if the prisoner had killed Knight, it would have been a case of murder. According to our penal code, " Murder is the unlawful killing of a human being in the peace of the State, by a person of sound memory and discretion, with malice aforethought, either express or implied." *Prince* 622. This definition is in substance the same with the common law definition. 3 *Inst.* 47, 51; 1 *East. P. C.* 214.

" Manslaughter is the unlawful killing of a human creature without malice either express or implied, and without any mixture of deliberation whatever; which may be voluntary, upon a sudden heat of passion, or involuntary, in the commission of an unlawful act, or a lawful act without due caution and circumspection." *Prince* 622. The assumption of the prisoner's counsel is, that the ingredient of malice is wanting. There is no proof of *express* malice. " Express malice is that deliberate intention, unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof." *Prince* 622. " An illustration of express malice, is where a deliberate

intention to kill a particular individual, is evinced, by former animosities, concerted plots, threats, or by the nature of the act itself."
2 *Chitty Crim. Law, t. p.* 480; 4 *Bla. Com.* 199. There are no external circumstances proven in this case, no previous animosities or grudges, no threats, no waylaying, no plots, which show a deliberate intention to kill Mr. Knight. But we think there was, in this killing, *implied* malice. " Malice shall be implied where no considerable provocation appears, and where all the circumstances of the killing, show an abandoned and malignant heart." *Prince* 622. There was in this case no provocation whatever, not a rude act, or an unkind word. Upon Knight's first approach, the prisoner told him to go back or he would shoot him; Knight retired, and the prisoner then came out of the kitchen door, where he stood, and got over the fence, Knight following him. At the distance of twenty feet, the prisoner then taking deliberate aim snapped his gun at him, cocked it, and snapped it again at him. As to this testimony, there is no conflict, and it conclusively demonstrates, that there was not only no *considerable* provocation, but no provocation at all. Further, all the circumstances of the killing, show an abandoned and malignant heart : a reckless disregard of law, life and social obligation. The legal sense of the term *malice,* is not confined to particular animosity to the deceased, but extends to an evil design in general, a wicked and corrupt motive, an intention to do evil, the event of which is fatal. *Fost.* 256; 4 *Bla. Com.* 198, 199, 200; 1 *East. Pl. Crown,* 215; 2 *Chitty Crim. Law,* 480. Stress was placed in the argument, upon the fact that the prisoner, previous to the assault, had retired over the yard fence, and that Knight had followed him. The *retiring* of the prisoner, however, was not from the attack, or threatening words, or attitudes, or actions of Knight, but voluntarily, and in peace, so far as Knight was concerned. It is not at all analagous to the cases in the books where the slayer retreats from the violence of an assailant ; the *following* by Knight was with no felonious intent, was attended with no violence of any kind ; he seems to have gone into the yard with a view to protect Mrs. Julian and her mother from the violence of the prisoner; and up to the time of the assault, had done and said nothing to him, either rude or provoking. The killing, upon the assumption that the prisoner was sane, was wilful, and from *that* the law presumes malice, and puts the prisoner upon showing that there was none. " Malice is implied," says C. J. Parsons, in Selfridge's case, " when the killing is attended with

circumstances which indicate great wickedness and depravity of disposition ; a heart devoid of social duty, and fatally bent on mischief." "Malice is implied," says Mr. East, "from any deliberate act, however sudden ;" he adds, "he who wilfully and deliberately does any act, which apparently endangers another's life, and thereby occasions his death, shall, unless he clearly prove the contrary, be adjudged to kill him with malice prepense." *Deliberate* killing, even with great provocation, is murder. The law does not fix the *time* of such deliberation. "If the defendant has *time to think*, and intends to kill, for *a minute*," says Judge Rush of Pennsylvania, in the case of *The State* vs. *Richard Smith*, "as well as for an hour or a day, it is a deliberate, premeditated killing, constituting murder." He adds, "To deliberate, is to reflect with a view to make a choice, and a reflection but for a minute is a sufficient deliberation. No time is too short for a wicked man to frame in his mind, a scheme of murder, and to contrive the means to accomplish it." *See as to distinctions between murder and manslaughter*, 4 *Dall.* 145 ; 2 *Mason R.* 91 ; 6 *Rand. R.* 721 ; 4 *Mass. R.* 391 ; 2 *Hill S. C. R.* 619 ; *The State* vs. *Tookey*, *So. Ca. Ms. decision, Dec.* 1819 ; 2 *Chitty Crim. Law* 480.

The record furnishes no evidence to rebut the presumption of malice, except what relates to the plea of insanity; it discloses no provocation, but on the contrary, the circumstances attending the killing, show, in the language of the statute, *an abandoned and malignant heart.* The plea of insanity set up in this case, does not affect the question we are now considering. We consider it irrespective of that plea, for the reason, that if the prisoner was not sane, he is wholly irresponsible and guiltless, not only of murder, but of manslaughter. We have no fault to find with the decision of Judge Floyd, upon this ground for a new trial, taken in the rule. [3.]    The fourth and fifth grounds upon which the plaintiff in error relied in his rule for a new trial, and upon which he *now* relies before this Court, relate to insanity, and may be united.    The Court below charged the jury as follows :

"A person, therefore, in order to be punishable by law, or in order that his punishment by law may operate as an example to deter others from committing criminal acts under like circumstances, must have sufficient memory, intelligence, reason and will, to enable him to distinguish between right and wrong, in regard to the particular act about to be done, to know and understand that it will be wrong, and that he will deserve punishment by committing it.

Roberts *vs*. The State of Georgia.

" In order to constitute a crime, a man must have intelligence
and capacity enough to have a criminal intent and purpose; and if
his reason and mental powers are either so deficient that he has no
will, no conscience, or controlling mental power, or if through the
overwhelming power of mental disease, his intellectual power is for
the time obliterated, he is not a responsible moral agent, and is not
punishable for criminal acts. If, therefore, you believe from the
evidence, that at the time of committing the act, the defendant had
memory and intelligence, *even a glimmering of reason*, sufficient to
enable him to distinguish between right and wrong, in regard to
the particular act about to be committed, to know and understand
that it would be wrong, and that he would deserve punishment by
committing it, you will find him guilty; otherwise, you will find him
not guilty."

The plaintiff in error excepts to the general proposition laid
down by Judge Floyd, that if a man has sufficient memory, intel-
ligence, reason and will, to distinguish between right and wrong, as
regards the particular act about to be done, he is liable to be pun-
ished. And also to the more specific proposition, that a man who has
even *a glimmering of reason*, sufficient to enable him to distinguish
between right and wrong in regard to the particular act about to
be committed, to know and understand that it would be wrong,
and that he would deserve punishment for committing it, is liable to
be punished. I do not perceive that there is much difference between
the two—I do not perceive, in fact, any difference between a
man's having memory, intelligence, reason and will, enough to
distinguish between right and wrong in regard to a particular act,
and *a glimmering of reason sufficient* for the same purpose. It
would certainly be wrong to hold every poor idiot, lunatic, or
insane person, responsible, who *has even a glimmering of reason*.
That proposition would be inhuman, and is unsustained by author-
ity; for almost all these stricken creatures have some faint glim-
mering of reason, but it may be very different if the glimmering
light of the mind is *sufficient* to enable them to distinguish between
the right and the wrong of the act about to be committed. For
the purpose of this review, I shall consider Judge Floyd as ruling
that if a man has reason sufficient to distinguish between right and
wrong in relation to a particular act about to be committed, he is
criminally responsible. He varies the same idea somewhat in the
forms of expression used, no doubt for the purpose of being fully
understood by the jury. But *that* is, I think, the rule which he

intended to lay down; and the question occurs, is that the true rule? We think, that in this case, it is.

I shall not attempt a review, at large, of the cases and learning to be found in the books, upon the subject of insanity. I shall undertake only a brief statement of the general principles which are at this day recognised, and particularly with a view to sustain the position taken in this case by the presiding judge. Any one conversant with the cases can not have failed to see, that this has been, for courts and medical men and legal commentators, a difficult and perplexing subject. Whether a man is sane or not, whether partially or totally deranged, and if only in part deranged, where accountability to the laws shall begin, and where end, are questions of great and embarrassing subtlety. The laws of the sane mind are but little understood; much less are the laws, if indeed such phraseology is predicable of it, of the unsound mind understood. We can judge of the one, by external developments and by our own consciousness; of the other, only by external indicia. There are few men so balanced in intellect as not at some times, and upon some subjects, to approximate towards derangement. All men, almost, have some train of thought in which the mind delights to run, at a comparative abandonment of the ordinary routine of thought. Intellectual enthusiasm, not unfrequently, approaches the line of insanity. The numerous cases of mania, or delusion, which leave the mind sound in general, but as to certain things, shattered or wholly obliterated, have increased the difficulty of any specific general rule as to the responsibility of those who are generally classed as insane. A crazy, or partially deranged person, is a mystery; such a person is so, by the *visitation of God.* The subject of insanity, is not responsible—humanity, reason, the law so adjudges. To punish an insane man, would be to rebuke Providence. Hence, in all definitions of murder, of which I have knowledge, the requirement is found, that the slayer must be of sound mind. Our own statutory definition, requires him to be "a person of sound memory and discretion." Accountability for crime, pre-supposes a *criminal intent,* and *that* requires a power of reasoning upon the character and consequences of the act; a will subject to control. For this reason it is, that a homicide, committed under the influence of incontrollable passion, is not murder. The reason is dethroned, the will is not subject to control, and in tenderness to human infirmity, he is considered as not having a malicious, murderous intent. The difficulty is to deter-

Roberts *vs*. The State of Georgia.

mine who is "a person of sound memory and discretion," who is incapable of a criminal intent, who is incapable of reasoning upon the character and consequences of the act, and who is without control over his will.    That is the work, that the labour.    Men are, upon proof of the criminal act, presumed to be responsible, and therefore the burden of proving irresponsibility devolves upon the defendant.

One does not fail to perceive, also, in looking into this subject, that the rules now recognised as governing pleas of insanity, are different from what they were in the time of Lord Coke, and indeed, long subsequent to his day.    The improvements in the science of medical jurisprudence, a more enlarged benevolence, and a clearer sense of christian obligation, have relaxed the cruel severity of the earlier doctrines.    The plea of insanity is now, as it ought to be, as much favoured as any other plea resting upon the ground of reason and justice.    Courts are not now afraid to trust the juries with the investigation of questions of insanity; nor are all cases now, as they once were, subjected to the application of one rule, unjust because of its sweeping generality.    There was a time when the insane were looked upon as victims of Divine vengeance, and therefore to be cast out of the protection of human laws, and beyond the pale of human sympathies.    Not so now. The insane hospitals of our land, founded by provision of public law and by private charity, prove that the insane are the peculiar care of the State, as well as of private benevolence.

As late as 1723, it was held in England, that for a man to be insane, *he must have no more reason than a brute, an infant, or wild beast.*

It seems then to have been believed that for derangement to protect its subject from criminal responsibility, it must be total in its character ; either manifesting itself in wild, ungovernable, and incongruous actions, or in stupid and passive imbecility.    It seems not to have been then understood that men might ordinarily act sensibly, and yet be insane ; and reason acutely or learnedly upon most subjects, whilst they were upon some one or more totally deranged.    This inhuman rule cut off from the benefits of this plea, all the partially insane, and admitted to its privileges only the raving maniac or the drivelling idiot.

The rule, which I apprehend is now more universal than any other, is in substance the one given in charge by Judge Floyd to the jury.  Mr. Chitty says, "in criminal cases the question is,

whether at the time the act was committed, the prisoner was incapable of judging between right and wrong, and did not then know that the act was an offence against the law of God and nature." *Chitty Med. Jurisp.* 345.

Mr. Shelford thus states the rule : " If a person, liable to partial insanity which only relates to particular subjects or notions, upon which he talks and acts like 'a madman, *still* has as much reason as enables him to distinguish between right and wrong, he will be liable to that punishment which the law attaches to his crime." *Shelford on Lunacy*, 458; *Lord Ferrers' case*, 10 *Howell State Trials* 947; *Arnold's case*, 16 *id.* 764; *Parker's case*, 1 *Collins on Lunacy* 477; *Bellingham's case*, *ib.* 636; *Offord's case*, 5 *Car. & Pay.* 168; *Rogers' case, Abner Rogers' Trial, p.* 275. In the case of Rogers, the Supreme Judicial Court of Massachusetts lay down the rule in the following words: " A person, therefore, in order to be punishable by law, or in order that his punishment by law may operate as an example to deter others from committing criminal acts under like circumstances, must have sufficient memory, intelligence, reason and will, to enable him to distinguish between right and wrong in regard to the particular act about to be done; to know and understand that it will be wrong, and that he will deserve punishment by committing it." This rule does not require total insanity, like the one previously referred to—derangement as to all subjects and in all actions—but if the prisoner is perfectly sane as to all other things, and wants, as to the act about to be committed, reason enough to distinguish between the right and wrong of *that act*—if he does not know and understand that *that act* is wrong, and that he will deserve punishment for committing it, he is irresponsible. So also on the other hand, according to this rule, the person may be deranged as to other things, yet if he has sufficient reason to distinguish as to the right and wrong of the particular act about to be committed—if he knows and understands that for committing that act he will be liable to be punished, he is a responsible agent and ought to be convicted. Such is the rule adopted by the Court below; it is sustained by great weight of authority, and, as I shall show, is the only rule which was applicable to the facts of this case. But even this rule has undergone some modification. There are some exceptions to it; one, certainly, which was first established in the leading case of *The King* vs. *Hadsfield.* The great speech of Mr. Erskine in defence of Hadsfield, has shed new light upon the law of insanity. So con-

clusive was that celebrated argument, that it is now looked upon by the profession as authority. In the records of forensic eloquence, ancient and modern, nothing is to be found surpassing Erskine's defence of Hadsfield, for condensation, perspicuity and strength of reasoning, as well as for beauty of illustration, and purity of style. In that case, he assumed the position, that a man might have reason sufficient to distinguish between the right and the wrong of the act about to be committed, and yet be irresponsible; that the mind might be cognizant of the distinction between right and wrong, as regards the act, and yet by reason of some *delusion*, overmastering the will, there might be no criminal intent. To apply this proposition, it was admitted by Mr. Erskine, that the act itself must be connected with the peculiar delusion under which the prisoner labours. This doctrine can be best understood by illustration, and it is illustrated by Hadsfield's case. He had been a soldier in the British armies, and had received several severe wounds, one of which, on the head, it was thought, had injured the brain, and caused the derangement under which he suffered. He imagined that he had constant intercourse with the Almighty, that the world was coming to a conclusion, and like our blessed Saviour, he was to sacrifice himself for its salvation. Unwilling to commit suicide, it was argued by Mr. Erskine, he sought to do an act which would forfeit his life to the law, and thus bring about the sacrifice, which, in his morbid imagination, he held necessary to the salvation of the world. Under the influence of this delusion, he shot at the king, in the theatre. Now, in this case, it was not pretended that Hadsfield was a raving madman, or an imbecile idiot; nor was it contended that he was incapable of knowing that shooting a pistol at the king, would, or might kill him, or that if he should kill the king, that he would deserve death for the act; (for that really was what he desired,) or that he was incapable of distinguishing between the right and the wrong of the act; but it was contended, that the delusion under which he laboured had so shattered his intellect, as to control his will, and impel him resistlessly to the commission of the act, and *therefore* there was no criminal motive, no wicked or mischievous intent, and if these were wanting, he was irresponsible. To use the language of Mr. Erskine, "Reason is not driven from her seat, but distraction sits down upon it, along with her, holds her trembling upon it, and frightens her from her propriety." Hadsfield was acquitted; and since that day, the exception which his case established has been

recognised.   *See Erskine's speech, in appendix to Cooper's Medical Jurisprudence ;* 29 *Howell State Tr.* 1281.

Thus far with safety we may assert, that certain principles have been established; yet it is true that these rules do not govern all cases.   It is conceded by the courts in England, practically if not in terms, that no rules can be so specific as to embrace the infinite variety of forms in which insanity, or derangement, may show itself; and that each case must depend very much upon the circumstances, facts and developments which attend it.   Thus, Lord Hale says, " It is very difficult to define the invisible line that divides perfect and partial insanity.   But it must rest upon circumstances, duly to be weighed and considered by the judge and jury, lest on the one side there be a kind of inhumanity towards the defect of human nature, or on the other, too great indulgence be given to great crimes."   So Taylor declares, " There are no certain legal or medical rules whereby homicidal mania may be detected.   Each case must be determined by the circumstances which attend it." *Taylor Med. Jurisp.* 649; *see also 5 Car. & Pay.* 168; 9 *id.* 525.   In the opinion which C. J. Denman gave before the House of Lords, in 1843, although adhering to the old rules, he says, " It is difficult to lay down any abstract rule on the subject, applicable to all cases, and each case must be decided, in great measure, upon the facts and circumstances peculiar to it, under the discretion of the court."

In the case at this bar, the evidence shows no particular delusion to control the will, " sitting upon reason's seat and holding her trembling, and frightening her from her propriety."   It does not come within the exception to the rule laid down by Judge Floyd, which was established in Hadsfield's case.   This case is embraced within that rule, and we think the Court below correctly gave that rule in charge to the jury.   If there was partial insanity in this case, about which we express no opinion, it was the effect of melancholy, growing out of disappointed love.   There was no proof of raving madness, nor of peculiar mania.   The prisoner had addressed Mrs. Julian, and been rejected; afterwards he talked occasionally incoherently, looked vacant in the face, sat up late at night, and wrote some silly letters, and all attended with a habit of intemperance.   At the time he committed the assault, and previously, he was violent, rude towards Mrs. Julian and her mother, and indecent in his conversation.   He seems to have been on that day the very person to whom Mr. Erskine denies the protection of insanity, one " who exhibits only *violent passions and malignant*

*resentments*, acting upon *real* circumstances, who is impelled to evil from no morbid delusion, but who proceeds upon the ordinary perceptions of the mind."

Let the judgment of the Court below be affirmed.