### JONES v. THE STATE.

1. There was evidence adduced on the trial from which the jury would have been authorized to find the defendant guilty of voluntary manslaughter, and the court erred in not instructing the jury touching that grade of homicide.
2. Under the facts of the case 'the judge should have charged the jury upon the subject of justifiable homicide, and should also by appropriate instructions have allowed the jury to pass upon the question whether or not the killing of the decedent by the accused in this case was one of those instances "which stand upon the same footing of reason and justice as those enumerated."
3. There was evidence which authorized the charge upon the subject of confession.
4. The saying of a witness introduced by the State, a short time before the shooting, in reference to his pistol, with which there was evidence tending to show that the witness and not the defendant in this case had shot the decedent, when a certain person offered to hand the weapon to him, to the effect that it was not loaded, that "there is nothing in it; it is no good now," was mere hearsay and should not have been admitted.

DECEMBER 11, 1912.

Indictment for murder. Before Judge Daniel. Bibb superior court. June 22, 1912.

*John R. Cooper, Minter Wimberly,* and *Jesse Harris,* for plaintiff in error. *T. S. Felder, attorney-general,* and *John P. Ross, solicitor-general,* contra.

BECK, J. Johnnie B. Jones was tried under an indictment charging him with the murder of Wiley Bishop. It appeared that at the time of the killing of Bishop the defendant, his uncle Thomas Jones, Bishop, and other persons were present in a room then occupied by Mabel Turner, a woman of loose character; that an altercation arose between Thomas Jones and Bishop; that language of an insulting character and opprobrious epithets were used by Thomas Jones of and to Bishop, and that upon the application of an opprobrious epithet by Thomas Jones to Bishop both men arose from the position in which they then were, or partially arose, and drew their pistols, and that, Thomas Jones's pistol being drawn, a shot was fired. There was evidence to show that Thomas Jones and Bishop, upon the sudden quarrel which sprang up between them, in the language of one witness, "went for their guns." Thomas Jones was tried for shooting Bishop, and, at a term of court anterior to that at which the present case was tried, was convicted of the offense of murder. On the trial of Thomas Jones

Johnnie B. Jones, the defendant in this case, testified that he, and not Thomas Jones, was the man who shot and killed the decedent, and previously to that trial he stated to more than one person that he was the man who had fired the shot which caused the death of Bishop. Mabel Turner, the woman already referred to, was present at the time of the homicide; and her testimony given on the trial of Thomas Jones was introduced as evidence in the present case. She testified in part as follows: "Bishop walked to the foot of my bed, and [Thomas] Jones says, 'What did you tell Mabel that lie for?' and Bishop says, 'I have not told her one,' and Jones says, 'You are a God damn lie,' and Bishop says, 'You are a God damn lie;' and about that time Bishop was sitting on the foot of the bed, and Jones on the trunk, and Jones says 'You are a God damn lie,' and Bishop says, 'You are another one;' and about that time Jones raised off the corner of the trunk and Bishop got off the foot of the bed, and Jones said, 'You heard what I said,' and Bishop said, 'You heard what I said,' and Jones reached for his pistol and Bishop reached for his; both of them reached for their pistols about the same time, and Jones pulled out his pistol and shot Bishop. Up to that time no blows had been passed. When Jones got up I don't remember whether he or Bishop either took a step forward, but I remember Jones getting off the trunk and Bishop off the foot of the bed. At the time they got up they were facing each other like we are, and were close enough together to lay their hands on each other, and could have slapped one another in the face, and it was while they were facing each other like that the shot was fired. I saw Jones with his pistol in his hands. Jones had his pistol in his hand next to me on the bed. I don't remember which hand he had the pistol in, but I saw the pistol. Mr. Bishop did not get his pistol out." The evidence just quoted, of course, tends to prove that Thomas Jones was the one who fired the fatal shot, there being testimony to show that only one shot was fired. But the statements made by Johnnie B. Jones himself and certain corroborating facts which were testified to by other witnesses tended to show that Johnnie B. Jones fired the shot. On his trial for the homicide of Bishop, Johnnie B. Jones stated, that he did not fire the shot; that what he had sworn on the trial of his uncle, Thomas Jones, was absolutely false, so far as it tended to show that he himself had fired the shot; that he had sworn falsely to save his uncle. The

jury returned a verdict of guilty, with a recommendation. A motion for a new trial was overruled.

1. One of the grounds of the motion complained that the court erred in failing to charge the jury upon the subject of voluntary manslaughter. This complaint is well founded. As between Thomas Jones and the decedent, Bishop, if the evidence of Mabel Turner and that of the witnesses who corroborated her be true, there was a mutual combat pending at the time the shot was fired, whether fired by Thomas Jones or Johnnie B. Jones. If Thomas Jones and Bishop, in the heat of passion provoked by the sudden quarrel, each attempted to draw a weapon for the purpose of shooting the other, the shooting of the other by either would have made a typical case of voluntary manslaughter. And if at the time the shot was fired Bishop was attempting to draw a weapon with the present intent of killing Thomas Jones under circumstances which would have made such killing, had it taken place, a felonious killing, and Johnnie B. Jones, under the excitement of passion suddenly flaming up at the sight of his uncle placed in peril of his life at the hands of one attempting to make a felonious assault upon him, and under the influence of that passion, without malice, shot and killed Bishop, such killing was voluntary manslaughter. And under the evidence which we have detailed above, the jury would have been authorized to find that the shooting of Bishop by Johnnie B. Jones was under the excitement of just such passion as is described, and that it was without malice, and that consequently the defendant was guilty of the offense of voluntary manslaughter. Of course if he shot under circumstances which made the killing not only a felonious one but one in which malice, express or implied, entered, then his offense was that of murder.

2. In another ground of the motion for a new trial complaint is made that the court failed to charge the law of justifiable homicide. Describing the altercation between himself and Bishop and the circumstances attending the killing of the latter, Thomas Jones, as a witness introduced by the State, used the following language: "I says, 'Bishop, did you tell Mabel that I told you so and so?' and he says, 'I did,' and laughed, and I says, 'You are mistaken,' and he says, 'I know you did,' and I says, 'You are sadly mistaken,' and I says, 'Where did you get that pipe dream?' and he says, 'I know damn well you did,' and I says, 'I did not,' and the lie and

damn lie was given, and I struck Bishop and the shot was fired. Bishop says, 'It is a lie,' and I says, 'It is a damn lie.' When Bishop raised off the foot of the bed I got off the trunk, and Bishop had his hand on his hip pocket when he raised. He went for his pistol and I went for mine, and I struck him with the butt end of mine. He got his pistol out, and the shot was fired. . . The whole trouble occurred between me and Bishop about Mabel Turner. Bishop's pistol was found on him, and it is in court. My presumption of it was Bishop intended to kill me if he hadn't been shot; that is what I thought; otherwise I never would have struck him." If this evidence had been deemed credible by the jury, they might have believed from this that when the defendant fired the fatal shot he did so to prevent the decedent from shooting and killing his uncle, Thomas Jones. If because merely of opprobrious words used by Thomas Jones, Bishop put his hand upon his hip pocket and made an effort to draw his pistol, and the other circumstances of the transaction were such as to excite the fears of a reasonable man that Bishop was about to draw his pistol for the purpose of shooting Thomas Jones, with no other provocation upon the part of Thomas Jones than the use of the opprobrious language quoted above, then Thomas Jones would have been justifiable in defending himself against the felonious attack of Bishop. And that being true, it was for the jury to say whether or not, if Johnnie B. Jones instead of Thomas Jones fired the shot which arrested the arm of Bishop, and did so for the purpose of preventing his shooting, it was a case calling for the application of the principles of criminal law in §§ 74 and 75 of our Penal Code, which read as follows: "Parents and children may mutually protect each other, and justify the defense of the person or reputation of each other." "All other instances which stand upon the same footing of reason and justice as those enumerated shall be justifiable homicide." The judge should have charged the law of justifiable homicide, and allowed the jury, under appropriate instructions, to say whether this was an instance of a killing standing upon the same footing of reason and justice as those enumerated in § 74 of the Penal Code.

3. The defendant had repeatedly stated that he had shot and killed the decedent with whose murder he was charged, without stating or claiming that there were any facts or circumstances of justification or mitigation; and the court did not err in charging upon the subject of confession.

4. The saying of Thomas Jones, a short time before the shooting, in reference to his pistol, when a certain person offered to hand it to him, to the effect that "there is nothing in it; it is no good now," was mere hearsay and should not have been admitted. This is true notwithstanding the fact that it was inferable from other testimony of the same witness that the defendant in this case was present. There was nothing in the remark that called for any answer or denial on the part of this defendant at the time it was made. Thomas Jones in making the remark had reference to his own pistol. Even if the defendant had heard him make the remark, he probably did not know whether it was true or not; and as it was made before the altercation which led to the killing and before anything had taken place that was connected with the killing, it related to something in which the defendant had no concern and could apparently have had none at that time, although after the killing the question as to whether or not Thomas Jones's pistol was loaded or empty was quite material. But as against this defendant it could not be shown by a remark made by Thomas Jones in reference to what then appeared to be an indifferent fact and one which in no way concerned the defendant.

Except as indicated above, no error is shown to have been committed by the court in the trial of the case.

*Judgment reversed. All the Justices concur.*