1. Although "the jury must accept as the law what the court charges them as being the law," and it is the province of the jury only "to apply the law so construed to the facts," so that in this sense alone are they "judges of the law" as well as the facts (Mims v. State, 188 Ga. 702 (4), 705, 4 S.E.2d 831, and cit.; Code, §§ 2-201, 27-2301), the mere use of the words "except that," in an instruction that "the charge of the court is the law of the case, and by it you are bound, except that you are the judges of the law in applying it to the facts as you find them to be," could not have misled the jury into conceiving that they would be free to reject the law charged by the court.
2. The evidence authorized an instruction on the law of confession, under the testimony of a witness that the defendant said he killed the deceased and would do it over again, where such statement of the defendant was not accompanied by any reason indicating justification or mitigation. Jones v. State, 139 Ga. 104 (3) (76 S.E. 748); Wright v. State, 136 Ga. 130 (70 S.E. 1102); Daniel v. State, 187 Ga. 411 (4), 413 (1 S.E.2d 6), and cit. *Page 101 
3. There is no merit in the exception to the charge as to the right of the jury to find the defendant guilty without a recommendation to mercy, or guilty with such a recommendation, and as to the forms of the verdicts, on the ground that the instructions were misleading or failed to inform the jury of their absolute right to recommend mercy, since the legal rule controlling the jury was correctly stated, and the jury were expressly instructed that they could recommend mercy "with or without a reason under the laws of this State." See Wheat v. State, 187 Ga. 480 (3) (1 S.E.2d 1), and cit.
4. It is "the general rule . . that instructions . . to the jury must be warranted by the evidence," and "where instructions are given that are not [so] warranted, . . and are calculated to . . confuse the jury, the error requires a new trial." Central Georgia Power Co. v. Cornwell, 139 Ga. 1 (2, a), 5 (76 S.E. 387, Ann. Cas. 1914A, 880), and cit.; Perry v. Hodgson, 168 Ga. 678 (4) (148 S.E. 659); Hastings v. Hastings, 175 Ga. 805 (3) (166 S.E. 192). The fact that the unauthorized instructions may have stated "the law correctly, in the abstract," will not avoid a new trial, if it is apparent that the jury might have been misled. Culberson v. Alabama Construction Co., 127 Ga. 599, 602
(56 S.E. 765, 9 L.R.A. (N.S.) 411, 9 Ann. Cas. 507).
(a) The judge fully and correctly charged the principles of law applicable to the defense of insanity in criminal cases, in giving the general rule of criminal responsibility as measured by the ability to distinguish between right and wrong in connection with the particular act. Roberts v. State, 3 Ga. 310; Rozier v. State, 185 Ga. 317 (2), 320 (195 S.E. 172), and cit. He also charged the correct abstract rule relating to delusional insanity, which under the evidence for the State was authorized, but on which the defendant did not expressly rely. The charge on delusional insanity did not constitute error, since it merely gave to the defendant the benefit of an additional defense, and could not have misled the jury as to the defense on which he expressly relied.
Judgment affirmed. All the Justicesconcur.
 No. 13160. APRIL 10, 1940.
Eustis Davis was found guilty, without a recommendation to mercy, of the murder of his stepmother, Mrs. Frank Davis. There was no dispute as to his having killed her, and the facts of the killing. The State introduced testimony that for several years he had made threats to kill her for the reason that she was keeping his father from giving him money, and to kill the father for "listening to her." One witness said that the defendant stated, soon after the homicide, he had killed the deceased "on account of his little brother; she didn't treat his little brother right." The uncontradicted testimony showed that at about eight o'clock at night, the defendant, his father, and three others drove in a car *Page 102 
to the home where the deceased, the defendant, his father, and other members of the family lived together; that on the way the defendant several times asked his father for $2, and the father refused with the statement "he would have to work some before he could get it," and the defendant replied that the father "would be sorry," and "to hush and not say anything else to him;" that when the car stopped in front of the home, and while light from a truck was shining on the house, and the occupants of the car and others were near-by, the defendant ran into the house, picked up a shotgun, came to the door, and without any warning shot the deceased while she was rocking in a chair on the front porch, with her back to the door.
As to the defense of total insanity at the time of the homicide, the defendant stated to the jury that a town marshal had "jumped on [him] and beat [his] head up with a blackjack, and broke [his] jaw, and [his] head gave [him] lots of trouble since then, and [he] had a headache all the time, . . and had to take stanback and aspirin or ammonia or something to keep [his] head easy all the time; and at times [his] mind wouldn't be right, and [his] head felt bad, and [he] couldn't see at times good;" that while pulling resin boxes in the woods he had "lost [his] puller twice," and couldn't go back and find it;" that he "had to take lots of stuff in the woods for [his] head, and all the time that he worked, and [he] couldn't see at times good;" that on the previous Monday he had driven a truck in the wrong direction, had to start back again after going several miles, "went so blind [he] couldn't see the road," and had not been "able to work;" that he "asked [his] Dad about letting [him] have $2, [the father] owed [to the defendant] some little bit of money for dipping that week, so he said `No, you didn't work today, and I ain't going to let you have it,' and [the defendant] got in the car and begged him all the way to the house, and [the defendant] got so mad and . . flew all to pieces and . . never realized what went on until away later — some few hours later [he] realized what had happened, and they told [him] that [his] Dad came in and . . shot at [the defendant] after [the defendant] shot her."
A witness for the State testified on cross-examination that the defendant "has told me he had headaches often and dizzy spells, . . took stanback a right smart . . for several months, he *Page 103 
wasn't always complaining of his head, just once in a while he would come up there and tell me he had a headache and say that he was dizzy and blind. . . He had not worked that day as I know of." The witness further said, "He has always acted all right to me." Another witness for the State, who had worked at the father's turpentine still, testified, that he had heard the defendant complain of his head; that "nearly every time he would get drunk, whenever he was sobering up, he would complain about his head; I never heard him complain about his head when he wasn't drinking;" that about five minutes after the homicide, when the witness caught the defendant, the defendant told the witness "there was something the matter with his head, and he weren't right, and told [another person], `You noticed I was crazy last night;' he said, `when we went off fishing and got lost.' Before he made this statement, he had run back somewhere, and I went to look for him to try to keep him from killing [his father]. He had threatened him as much as he had her. He said, whenever he got started, there wasn't nobody could stop him until he done what he put into to do, and I begged him not to do it, and I told him they would electrocute him if he did, and he said they wouldn't. He said, `They just won't let me be electrocuted;' he said, `They might send me off for a few months, but they wouldn't let me be electrocuted.' . . He would come up there where I was night-watching, and [the deceased] was about all he would talk about. This continued for five years and eight months. I thought, when he was drunk, he was about half crazy, and he would make these threats to anybody that would talk with him when he was drinking." The witness further said that the defendant "had been drunk three or four days before the killing. I don't remember just how long. . . I didn't see him drink any liquor, but I could smell it. Sometimes he would walk a little straight, and sometimes he couldn't. The night he killed [the deceased], he could walk a little straighter than he had been walking."
Rebuttal witnesses for the State testified that at stated times soon after the homicide, while the defendant was in jail, he "didn't seem to be abnormal," he "seemed like he always was, . . talked with good sense," said "he done it and wasn't sorry of it, and if it was to do again he would do it over again," and while in jail had not "complained" to the sheriff or jailer "of a headache or *Page 104 
blindness or lapses of memory," or asked for any stanback or aspirin tablets. The defendant stated to the jury that his uncle had supplied him with aspirin tablets while in jail.
On the sole defense of total insanity at the time of the homicide, the court charged the jury: "The rule of law in force in this State which relieves one from criminal responsibility for the commission of an unlawful act on account of mental disease is, if a man has reason sufficient to distinguish between right and wrong in relation to particular acts about to be committed, he is criminally responsible. An exception to this rule is where a man has reason sufficient to distinguish between right and wrong as to a particular act about to be committed, yet, in consequence of some delusion, his will is overmastered and there is no criminal intention; provided that the act itself is connected with the peculiar delusion under which the prisoner is laboring. This, gentlemen, is a question of fact to be determined by you. If you should believe that the defendant had reason sufficient to distinguish between right and wrong relative to the particular act charged against him in the bill of indictment, and that he actually committed the act, but that at the time of its commission, in consequence of some delusion with which the act itself was connected, his will was overmastered, and there was no criminal intention on the part of the defendant with reference to such act, then you should acquit the defendant." After in effect repeating the latter sentence, the charge continued: "In other words, gentlemen, if you believe that the defendant had sufficient reason to distinguish between right and wrong with reference to the act charged against him, he may nevertheless not be legally responsible therefor, if by reason of a delusion or mental disease he had so far lost the power to choose between right and wrong and avoid the doing of the act in question as that free agency was at the time destroyed; provided that the alleged crime was so connected with such mental disease in relation to cause and effect as to have been the product of it solely. If, on the other hand, you believe beyond a reasonable doubt that, if the defendant committed the act charged against him in the bill of indictment, and in the manner therein charged, and that at the time of its commission he was not suffering from such mental infirmity as to render him incapable of distinguishing between right and wrong with reference to such act, and his will was not overmastered in consequence of some delusion *Page 105 
connected with said act, so as to render him powerless to choose between right and wrong with reference to said act and to avoid the doing of the act in question, then he would be legally accountable for the same, under the rules and instructions given you." Exception is taken to these quoted instructions, except the first sentence, on the ground that the defendant made no contention that his will was overmastered by any "delusion;" that there was no evidence as to that form of insanity, so as to authorize the instruction thereon; and that "telling the jury that this was a question of fact to be determined by them" was confusing and prejudicial as to the real defense of insanity. Other exceptions to the charge are indicated in the syllabus.