## MARS *v.* THE STATE.

1. In the bill of exceptions error is assigned upon the fact that during the time the court had the motion for new trial under advisement an affidavit of J. M. Roberts was presented to the court without notice to movant or his counsel, and was ordered filed and made a part of the record in the case, without service of the affidavit upon the defendant or his counsel.  This assignment raises no question for determination by this court, inasmuch as neither the affidavit nor its substance was set forth in the bill of exceptions.  There is an affidavit of J. M. Roberts in the record, but it is not in the bill of exceptions in any

---

Criminal Law, 16 C. J. p. 752, n. 15, 16; p. 753, n. 28 New, 30; p. 878, n. 35; p. 960, n. 57, 72; p. 1027, n. 17; p. 1043, n. 32; p. 1047, n. 65; p. 1050, n. 84; p. 1055, n. 93; p. 1061, n. 61; 17 C. J. p. 60, n. 53; p. 89, n. 68 New; p. 178, n. 94; p. 263, n. 79-½; p. 317, n. 10; p. 321, n. 47.

Homicide, 30 C. J. p. 221, n. 24 New; p. 359, n. 21; p. 414, n. 79.

Juries, 35 C. J. p. 321, n. 41 New.

way identified as the affidavit to which reference is made in the assignment of error just stated.

2. One who is closely related to persons who assist the solicitor-general in striking a jury in a criminal case is not incompetent, for that reason, to sit as a juror in that case.

3. Affidavits to show that one of the jurors was disqualified because of bias or prejudice were filed, but the juror sought to be impeached denied in substance the statements contained in these affidavits; and the court having decided that the juror was not disqualified, his holding will not be disturbed.

4. The court did not err in refusing to give to the jury a charge upon the subject of delusional insanity. Such a charge was unauthorized by the evidence.

5. Complaint is made of the admission in evidence of the following portion of the testimony of a witness for the State: "When Ball Mars came to my house to see Mrs. Mars about going back, she told him that she was going back down there as quick as she could get it fixed where she could be with the children, but that she would not move back down there with Oscar Mars there. I don't know whether she then said why it was she would not go there with Oscar Mars there." The evidence does appear to be irrelevant and immaterial, but it does not appear to be harmful to the defendant.

6. In view of the ruling above, that there is no evidence to authorize the charge on the subject of delusional insanity, the court did not err in refusing to permit a medical doctor as a witness to answer the following question propounded to him on cross-examination by movant's counsel: "When you talked to him [defendant], was he very much disturbed about the fact that he thought his wife was untrue to him?"

7. Movant's counsel propounded to the witness last referred to the following question: "If there was no cause for it [defendant's suspicion of his wife's infidelity], and she did not give him any reason to suspect her, and there was no cause, and as a matter of fact, but he simply contended as he did to you that she was untrue to him, or untrue to her marriage vow, would that in your opinion indicate that his mind was unsound on that one question?" The court, upon objection of State's counsel, refused to admit the answer to the question. *Held*, that this ruling was not error. The question propounded was not one for the opinion of a witness, though an expert, but was strictly a question for the jury. Besides, a medical expert could not possibly have formed an intelligent opinion as to this question without reference to other circumstances and facts. This ruling applies to the assignment of error in the ground of the motion for new trial next immediately following that here dealt with.

8. Movant's counsel propounded also the following question to the same witness referred to above: "Doctor, is it true that a man can be insane on some questions and kill somebody, and yet be perfectly sound about other questions?" To this question State's counsel objected on the ground that the witness had not qualified as a mental expert. The court sustained this objection. It is not stated in the ground whether the doctor referred to had qualified as a mental expert or not. Therefore it does not appear that this ruling of the court was error.

9. Error is assigned upon the following testimony, which was admitted over objection of defendant's counsel: "While I was treating him since that time I have not observed any evidence of mental derangement or insanity about him in any form. From my knowledge of him as a physician and from my observation of him while I was doctoring him for rheumatism, and my conversation with him since, including the last time I talked with him, it is my opinion that he is sane and knows right from wrong." The ruling admitting this testimony was not error; for a non-expert witness could give his opinion as to the sanity of the accused, based upon conversation with him; and if it was incompetent for the witness to testify from his knowledge of him as a physician, because the witness was not a mental expert, that part of the testimony is not specially objected to. And where the objection is to testimony as a whole and a part of it is admissible, the admission of all of it will not be held to be error requiring the grant of a new trial.

10. The court did not err in refusing to permit the witness Dorminey to answer the following question of movant's counsel: "In that conversasion [which the solicitor-general had just asked about, and to which Dr. Dorminey had sworn that he had with the defendant] did he appear and did his conversation indicate that he was in earnest in his belief that his wife was untrue to him?" This was not error, for the reasons stated in headnote 7 disposing of the assignments of error in grounds 8 and 9 of the motion for a new trial.

11. In ground 13 of the motion error is assigned upon the court's permitting a witness for the State to testify that he knew Mrs. Mars (the deceased); she worked in the mill; he knew her reputation for virtue and chastity in the community in which she lived, and it was good. Whether this testimony was objectionable or not at the time it was admitted, is doubtful, but it was made material and relevant by portions of the defendant's statement; and if it was error to admit it at first, the error was cured when the defendant made statements attacking the chastity of his wife.

12. The court charged the jury, in part, as follows: "Now, if you find and believe that the defendant did, in this county, at any time prior to the filing of this indictment, with the weapon named in the bill of indictment, and with malice aforethought, either express or implied, shoot and kill Jennie Belle Mars, as charged in the bill of indictment, then you would be authorized, and it would be your duty, to convict the defendant of the offense of murder; and in that event the form of your verdict would be, 'We, the jury, find the defendant guilty.' That would mean that he would be electrocuted, as now provided by law, unless the jury sees fit to recommend him to the mercy of the court. That is a recommendation you have the right to make and attach to your verdict, in case you find a verdict of guilty, and to make it either with or without a reason, for any reason that is satisfactory to yourselves, or without a reason, arbitrarily; it is a matter of your discretion." This charge was criticised upon the grounds: (a) Said charge told the jury that they had a right to recommend the defendant to the mercy of the court for any reason "that is satisfactory to yourselves." (b) Said charge was misleading in that it instructed the jury that they could recommend the defendant to mercy "with or

without a reason, arbitrarily," and also "for any reason that is satisfactory to yourselves." The charge was not error for either of the reasons stated.

13. The charge upon the subject of the form of the verdict was not error when the entire charge upon that subject is considered.

14. The court did not err in failing to charge upon the subject of voluntary manslaughter, as this grade of homicide was not involved under the evidence; and if it was involved under the prisoner's statement, the court was not required to charge upon it in the absence of a pertinent written request.

15. Error is assigned upon the failure of the court to charge as follows: "The punishment for persons convicted of murder shall be death, but may be confinement in the penitentiary for life in the following cases, if the jury trying the case shall so recommend . . and if they do so recommend, such confinement in the penitentiary for life is not discretionary with the judge." The exception to this charge is without merit, in view of the court's actual charge; for the court instructed the jury as follows: "You may, if you find the defendant guilty, you may fix his punishment. A simple verdict of guilty means electrocution. A verdict of guilty with the attachment thereto of a recommendation to mercy of the court means a sentence to imprisonment in the penitentiary for life. In this sense the jury trying capital cases, a case where a capital offense is alleged to have been committed, fix the sentence of the court, and the presiding judge has no discretion thereafter to revise or modify or change it in any respect whatever."

16. The charge of the court calling the attention of the jurors to the importance of their duties and impressing upon them the duty of deciding fairly, from the evidence and the prisoner's statement, the issues involved, is not open to the criticism made upon it.

No. 5278. OCTOBER 15, 1926.

Murder. Before Judge Crum. Ben Hill superior court. January 2, 1926.

The indictment alleged that Oscar Mars did kill and murder Jennie Belle Mars by shooting her with a pistol. The deceased was the wife of the defendant. It appears from the evidence that she had been living separate from him; that he had been staying at home with five or six small children; and that on a Sunday night she went to his home to get some clothes. According to the theory of the State, the defendant, when she started to leave, jumped in the car and shot and killed her. In his statement he contended that she struck him with a wrench; that in the loss of mind he did not know what happened; but presumably, from his statement, he shot and killed her during said interval. The State contended that it was deliberate murder without mitigation. The defendant's theory was, that, on account of the terrible disease from which he had been suffering, his mind had become affected;

that he was laboring under a delusion that his wife was untrue to him; that the disease and the delusion had unbalanced his mind; and that at the time he committed the act he was not responsible.

G. M. Hardwick, a witness for the State, testified: He had known Oscar Mars about eight or nine years. At the time his wife was killed Mars lived at the cotton mill in Ben Hill County. Witness had known the wife, Jennie Mars, about the same length of time. The homicide took place on Sunday night in July, 1925. The defendant and his wife were not living together at the time she was killed. At the time of the killing she was staying with witness and his wife. She came there on Friday at noon before she was killed on the following Sunday night; stayed at his house continually from Friday evening until Sunday night. On that Sunday before she was killed, Mrs. Mars, the wife of witness, and witness went to the house of Jack Mayes. Mrs. Mars suggested that they go to see Mayes. The defendant was not present. His son and witness went to him and acquainted him with the fact that his wife wanted him to go with her to see Mayes; and he said, all right, let him eat a mouthful, for he had not had dinner. Mayes was superintendent of the mill where defendant worked. Witness had no conversation with Mars, after his wife separated from him, about his relations with his wife. He had asked witness not to board her if she came to his house; witness told him that if she came to his house he would not take her to board, but he could not run her off if she came and wanted to spend the night. When witness went down, Sunday afternoon, to get the accused to accompany them to the house of Mayes, defendant came on back with witness and defendant's son, and the wife of witness and Mrs. Mars got into the car. When they got back to the house of witness they then went to Mayes' house, but had no conversation with Mayes, as he would have nothing to do with the affair and did not want to see them. Mars did not speak to his wife on this occasion, and when she got out of the car he said nothing to her. She got out of the car when she got to the house of witness, and defendant remained in the car. Mars was in the car at the time and remarked to witness, "If I was you I would not put up with this; she would have to go with us or move away, one." The witness narrated certain other events, not material, as to a trip to some other places, etc. He then told of going down to the house

where Mars lived, and when they drove up to the house Mrs. Mars called her son Lloyd. Ball Mars told her he was asleep. At this time Ball Mars and Oscar Mars were standing on the doorstep of the Mars house. Oscar Mars came out to the car, and a conversation took place. The defendant asked his wife where she had been that night; she told him she had not been anywhere; and he said he knew better, that she had been down to the church to get some one to take her to Cordele. Witness then spoke and said, "No, she hasn't been away. from my house since Ball and the children were there;" and he said, "I will be damned if I am going to stand for this any longer." Mrs. Mars told witness to crank up and drive away, and she would get her dress the next day. The defendant said, "Get out of this car. I mean get out of here," and she says, "Drive on, drive on," and "I drove on then, and he grabbed the car as I started off. I suppose he got on the running-board; he got on the inside of the car. She was screaming when he got in the car, screamed before the pistol shot, was screaming [at the] time I started off. I had driven about seventy-five yards, I reckon, before the pistol shot. She screamed when the pistol fired. I can't say positively how many times the pistol fired. I know when he fired the third time she never screamed any more. When he first fired the pistol I looked around. I couldn't see him when I looked; it was dark back there. If there was anybody else in the car there I never saw them. I stopped the car when he ordered me to. He says, 'George, stop this car, and I don't mean may be;' and I stopped it. He then opened the door, got out of the car, the rear of the car, and shut the door. When he got on the ground he struck a match on his pistol and looked at her and says, 'I done it. I had it to do, and I done it.' The woman was still at that time, I could see her when he lit the match, her face was bloody, brains and blood all over her face, she was kind of propped up against the wing of the back curtain. Then I asked him was he mad with me, and he said no; but he was loading his pistol again, and I pulled out and left from there. I don't know what become of him after that; he was standing by the side of the road when I left. I have had no conversation with him since that time." Mrs. G. M. Hardwick corroborated the material portions of this testimony.

.. The defendant made a lengthy statement. He told of his many

financial troubles and troubles with his wife; of diseases of which he had suffered; of his struggles with poverty and the behavior of his wife. In many parts of the statement recitals were made that reflected upon his wife's good character. That Mars shot his wife as alleged is not controverted. The jury returned a verdict of guilty, without a recommendation. The defendant made a motion for new trial, which was overruled, and he excepted.

*W. H. Lasseter* and *A. J. McDonald*, for plaintiff in error.

*George M. Napier, attorney-general, J. B. Wall, solicitor-general,* and *T. R. Gress, assistant attorney-general*, contra.

BECK, P. J. (After stating the foregoing facts.) There were witnesses other than these referred to in the statement of facts, and certain portions of their testimony will be referred to; but it is not necessary to make a lengthy statement of the evidence given by these witnesses for the State. Further reference will also be made to the statement of the prisoner, as parts of his statement are material to the decision of a most vital question in the case.

1. The ruling made in the first headnote need not be elaborated.

2. One ground of the motion for new trial complains of the refusal of the court to order that the jury be purged "as to relationship" to E. H. Dorminey, sheriff, J. B. Roberts, deputy sheriff, and J. W. Scarbrough, a constable, inasmuch as these officers "went to the table where the solicitor-general was seated and began to confer with reference to the jurors to be taken." The court's attention was called by movant to the fact; and it was insisted that if these officers were to assist the State in striking the jury, they had become voluntary prosecutors, and the jury should be purged. Thereupon Roberts, the deputy sheriff, and Dorminey, the sheriff, were examined as to the part they had taken in striking the jury. The deputy sheriff testified: "I am purposing to take a part in the striking of this jury. Mr. Wall asked me awhile ago to help him strike the jury; and it is my purpose to give him what assistance I can, to sit with him at the table there and help strike the jury in this case. I haven't taken any interest in the prosecution in the way of getting witnesses, or anything of that kind; have not discussed with any witness the question of taking a warrant against the defendant's brother.

I was at the table at the request of the solicitor; don't purpose to have anything further to do with the trial, except to help strike the jury upon request of the solicitor. I have not taken sides one way or the other in the trial of the case. I don't know who was present when the solicitor asked me to help strike the jury; it was over there just a few minutes ago; he just told me to move my chair over there and help strike the jury. I was sitting off to one side, wasn't at his table when he asked me. I think that he asked the sheriff at the same time; he says, 'You and the sheriff and Mr. Scarbrough come over and help me strike a jury,' and we went over for the purpose of helping him strike the jury." Dorminey, the sheriff, testified: "The solicitor asked me would I help him strike the jury, and I told him that I would. It is my purpose to help in striking the jury in this case. I don't know whether I can render any assistance or not. I have got a few kinfolks in this county. I have been sheriff about nine years, and know a good many people in the county; know practically every man on the jury at this term; know where most of them live, and their folks, and things of that kind. I don't know that I would give the State the benefit of my knowledge in securing this jury, can't say whether I would have much to say or not; every once in a while Mr. Wall wants my opinion when a fellow's name comes up. In striking this jury I would give Mr. McDonald such information as I had about a prospective juror if he asked it. I was sitting around the solicitor's table, I think, when he spoke to me and asked me to help him strike the jury. If Mr. McDonald, for the defendant, should ask me about any jurors, I would give him my opinion. I haven't been taking any interest in getting the State's case ready in this case out of the ordinary. I have done like I do in all other cases. I think that the sheriff has his duties; have done no more in this case than I would in any other case. I subpœnaed the witnesses, or had the other boys to do it. I haven't tried to talk to the witnesses and figure on the case; some of them have talked to me when the warrant was sworn out. I don't think I have talked with Mr. Hasty, but I may have. I didn't stay out there when the matter was presented to the grand jury, and help to get the witnesses before the grand jury any more than I do in any other case. I was just there. I generally stay out there all through the court." At the conclusion of the evi-

dence the court overruled the motion to disqualify the relatives of either of the officers, and a relative of the deputy sheriff served upon the jury.

We do not think the court erred in holding that jurors related to either of the officers, under the facts stated above, were not disqualified. It does not appear very distinctly just what aid or assistance was given by these officers to the solicitor-general. This assistance had not been rendered before the jurors had been summoned and the panels had been selected. We assume that the solicitor-general, counsel for the State, called these officers to inquire about certain members of the jury, their relationship, the places of their residence in the county, perhaps, and many other facts which he desired to know in order to intelligently strike the jury. Questions similar to the one here raised have been decided by this court and the Court of Appeals. In *Caswell* v. *State*, 27 *Ga. App.* 76 (107 S. E. 560), it was said: "One who is closely related to persons who assist the solicitor-general in striking a jury in a criminal case is not incompetent, for that reason, to sit as a juror in that case. *Atkinson* v. *State*, 112 *Ga.* 411 (37 S. E. 747); *Griffin* v. *State*, 18 *Ga. App.* 402 (4), 404 (89 S. E. 625); *Williams* v. *State*, 23 *Ga. App.* 518 (98 S. E. 557)."

3. The ruling made in the 3d headnote need not be elaborated.

4. Error is assigned upon the refusal of a written request to charge the jury, duly tendered to the court, as follows: "If you find from the evidence, statement of the defendant and the facts of this case, or from either, that at the time the alleged offense was committed the defendant was laboring under a delusion that his wife was unfaithful to him, and that this delusion had undermined his reason, and that at the time of said offense, because of such delusion, the defendant was unable, because of his mental condition, to control his will and know what he was doing, then and in that event you should acquit the defendant." We are of the opinion that the court did not err in refusing to give this in charge. We do not think it was authorized by the evidence or by the statement of the accused. We do not think that when the entire evidence, including the statement of the accused, is considered, the court was required to give a charge requested in writing upon the subject of delusional insanity. Counsel for the plaintiff in error urged that under the ruling in the case of *Roberts* v. *State*,

3 *Ga.* 310, the charge was pertinent, and that it was error to re-fuse to give it. The principle laid down in the *Roberts* case, to which reference is made, is fully discussed in the case of *Flanagan* v. *State,* 103 *Ga.* 619 (30 S. E. 550). In that case it was claimed by the defense that although the accused committed the homicide, he was not guilty of any crime, because, by reason of the delusion under which he was laboring at the time of the killing, he was unable to form in his mind an intent to commit a crime. They claimed that he was laboring under a form of mental disease known as paranoia or delusional insanity, that a person afflicted with such mental disease has a delusion or delusions which dominate but do not destroy the mental capacity, and that although the accused was sane as to other subjects, on that of the delusion and its direct consequences he was an insane man. They contended that the delusion in that case was one known as the delusion of persecution, and that Flanagan, believing that he was being unjustly persecuted by persons and that he was endeavoring to escape from his persecutors, and finding his escape cut off and that there was nothing else to do but to slay his persecutors, he proceeded to do so. It was claimed that if all these conditions were true and the accused acted under these delusions, he was not responsible for the killing. There was evidence to sustain the theory of delusion, and upon that evidence counsel for the accused requested the court in writing to give the following in charge to the jury: "Was the defendant at the time of the commission of the alleged crime, as matter of fact, afflicted with a disease of the mind, so as to be insane? If such be the case, did he know right from wrong as applied to the particular act in question? If he did not have such knowledge, he is not legally responsible. If he did have such knowledge, he may nevertheless not be legally responsible, if the two following conditions concurred: (1) If, by reason of the duress of such mental disease, he had so far lost the power to choose between right and wrong and to avoid doing the act in question, as that free agency was at the time destroyed. (2) And if at the same time the alleged crime was so connected with such mental disease in the relation of cause and effect as to have been the product of it solely." The judge refused this request, but charged generally the doctrine that one is criminally responsible who has sufficient reason to distinguish between right

and wrong as to the particular act committed by him; and, on the subject of delusions, charged as follows: "If, in consequence of a delusion connected with the act in question, the will is overmastered and the reason is dethroned as to that particular act, there is no criminal intent as to that act, and hence no criminal responsibility for that act. But it is not every delusion of a man that would render one irresponsible; it must be such a delusion as is connected with the act in question, and must be such a delusion as overmasters the will and dethrones reason as to that particular act."

This court held that the trial court erred in refusing to give the requested charge or its substance, and that he also erred in the charge he did give upon the subject. And Chief Justice Simmons, delivering the opinion of the court, said: "Courts, both in this country and in England, have for a long time differed as to the soundness of the doctrine of the request above set out, but this court has been committed to it for over fifty years. In the case of *Roberts* v. *State*, 3 *Ga.* 310, Nisbet, J., discusses the subject of insanity and delusions, in an exhaustive opinion. That case announced the following proposition as the law upon this question: 'If a man has reason sufficient to distinguish between right and wrong in relation to a particular act about to be committed, he is criminally responsible. An exception to this rule, however, is, where a man has reason sufficient to distinguish between right and wrong as to a particular act about to be committed, yet, in consequence of *some delusion,* the will is overmastered and there is no criminal intent. Provided that the act itself is *connected with* the peculiar delusion under which the prisoner is labouring.' This case has never since been overruled, doubted, or questioned by this court, but has been recognized. and approved in the only two cases where the subject of delusions has been treated since that time." At first blush, it might seem that under the decision in the *Flanagan* case, and the reasoning upon which it is based, the charge requested should have been given. But there are differences in the facts. In the *Flanagan* case there was evidence sufficient to sustain the theory of delusion. under which the defendant claimed that he was acting; that Flanagan believed that he was being unjustly persecuted by certain persons, and "he was endeavoring to escape from his persecutors, and,

finding his escape cut off, and that there was nothing else to do but to slay his persecutors, proceeded to do so." In this case we do not find sufficient evidence, giving to the prisoner's statement the weight of evidence, of the existence in the mind of the prisoner of a delusion as to any fact which could have in any way justified the crime and which dominated his will. There were many statements of circumstances which aroused jealousy. And he *was* jealous at times. In part, the evidence and the statement of the prisoner upon that subject is as follows: A daughter of the defendant, sworn as a witness for the State, testified that on one occasion the mother and the father had fussed in her presence; that she did not know exactly what he would say, but that "they fussed about jealousies." It is also shown that the defendant had various diseases. One of his daughters, who was sworn as a witness for the State, testified: "My father had been sick about three years, had rheumatism; he suffered much; his feet are all drawn over with it still; he had days that he would cry like a child with his feet; that lasted for nearly a year." The same witness testified that he had rheumatism nearly all his life. "He was jealous, and far as I know without cause. I didn't see any cause for his being jealous; he was also suspicious without cause; there was nothing in the world to cause him to be suspicious or jealous. The trouble about a fellow named Ewing, about my mother being in the car with him, was not the first time they had trouble; they had trouble about lots of people. Ben McVey and John Mullis and Nick Bentley, is all I can name now."

Lloyd Mars, a son of the accused, sworn on behalf of the State, testified, in part: "Before this Saturday night that he told her to leave there and not come back, he had threatened her; he threatened her the Friday night before that; us children were on the porch, and he says, 'Children, do you all think you can take care of yourselves?' And I spoke and asked him why; and he says, 'Well, I think slow driving and low conversation would be the best thing here,' and he says, 'There aint no telling what morning will bring about.' I heard him threaten to kill her on the first Sunday in July. Mr. Bill Urie's baby died that Saturday, and she went to see the child that evening, and Sunday afternoon he told her, 'I would rather you wouldn't go; you have got to take care of the children,' and she turned and says, 'Lloyd, can't you

look after the children until I can go up there?' And I told her I would, and she went up there. Mrs. Urie was sick, and her and Mrs. Maxwell come back to the house together, and he was still there; and they went on in the room and talked awhile, and when they come back on the porch and Mrs. Maxwell left, my father told her, 'You go and get your rags and leave, I am done with you,' and he says, 'I mean go, if you don't go I am going to beat you to death,' and she went out there in the front yard, and my sister and my uncle and his wife had all gone up the road to walk, and when they come back she was out there in the yard, and my sister asked her what was the matter, and she told her, and then Ball and my aunt come on over there and begged him to do right, and they went back together that night, and after he laid down he told us children he was going to kill her, and my sister she told him that if she was him she wouldn't do that, and he jumped up and started after my sister, and she caught him by the hands, and throwed her arms around his neck and went to crying and begging him to behave, and he went on back and lay down, and my mother went to Mrs. Hasty's on Monday after they parted on Saturday, and he got after my mother to go back, and she told him that she was scared of him and didn't want to go back, and then he turned to Mrs. Hasty and says, 'You see I have done all that I could,' and he says, 'I am leaving here to-morrow, and you all will be surprised,' and he said that he was going, and if something wasn't done she would go before he did."

The defendant's statement, in page after page as reported, relates matters that are utterly immaterial. In one part, after telling of the surroundings at the mill in which he and his wife worked, he said: "Later on I got to noticing my wife and Mr. Bill Urie, a loom fixer at the cotton mill, continuously laughing and talking all the time from just one thing to the other; they were conversing with each other all the time; every time that he could make it convenient to get to her loom he was there; and I told her, I says, 'Mother, it won't do.' I says, 'People will talk about you.' I says, 'That man has got a wife and children; and even if he didn't have, you have got some children and got a piece of a man, so quit that,' and she says, 'Yes, I realize that I have got a bag of bones, an old wrinkled-face, snaggled-tooth, no account thing that aint worth a dime,' and I says, 'Well, Mother, don't do that. I

can't help it what sort of shape I am in, God Almighty fixed me like I am, I reckon,' and I says, 'I can't help it to save my life.' Well, that went on, and from time to time I would go down to the mill when I felt like it and was able to go down there to help her some, and nine times out of ten when I would get there this man and her was standing laughing and talking, just about as close as they could possibly get. Well, I was continually after her about this man. I knew his way of doing. I knew his character. I knew that he had tried to slip my daughter and Mr. Hasty's daughter and another young lady out of the theater one evening, because my daughter was lady enough to come and tell me about it. He absolutely did that." In another part of his statement the accused referred again to Bill Urie and the deceased, and said: "I walked up by the side of the loom where my wife was at work. Mr. Bill Urie and my wife was standing there talking, and they were so busy until they never seen me, they didn't pay no attention to me at all, and every loom that she had was stopped, and she was running eight, and they had sent the boy to the store; so that they had every loom stopped of that sixteen looms. They were standing up there just enjoying themselves better than I ever did at a picnic when I was single and frolicking with the girls. I stood up there and looked at them and watched them, and thinks to myself, 'My God, my God, what is to happen?' I just stood there and watched them, and thought of my awful condition that I was in. I walked on up behind her and touched her over her loom, and she jumped and was as white as cotton, and he was the same. They looked like they didn't know what to do." Further on in the statement are references to other men of whom the defendant seems to have been jealous. He tells of difficulties with his wife, of her having bobbed her hair over his protest; of his trying to have prayer, and her laughing at him. He draws a picture of a most miserable state of domestic affairs; of his wife having sworn out a warrant against him; of his efforts to get his wife to live with him and his children. He declares that his wife's mind "wasn't right." He tells of his love for her and how hard he worked for her; of his earnest efforts to provide comforts for her and even luxuries in the midst of his destitution. He describes his broken down condition physically, of the diseases he has suffered, rheumatism, pyorrhea, and other troubles. He re-

ferred to a special occasion when he was asked to go down to the river with his wife and Mr. Hardwick and his wife, and of his belief that if he went with them he would have been killed; and stated further, in this connection, "I believe, as much as I believe that I am living to-day, that if I had gone to the river with them folks that evening, I would never have come back until I had been brought back dead."

Continuing his statement, the accused described the coming of his wife on the Sunday afternoon when she was killed, saying, "They drove up in the car somewhere near ten o'clock I would suppose, and I had cried and begged all the afternoon for somebody to help me to get my family straight, and it seemed like that the more people tried to do it the worse shape it got in. I had been praying to the Lord for advice and guidance as to which way could I do and could I turn. Well, they drove up, and I asked her—no, wait a minute. Just before they drove. up I asked· my brother for a chew of tobacco, and he says, 'I haven't got any tobacco; I have got some snuff,' and I says, 'Well, give me a little of it,' and he handed me the snuff-box· and I taken a little of the snuff and handed it back to him. They drove up, and I walked on out to the car. When she spoke she called Lloyd, and he was asleep, and my brother asked her if Onnie Belle wouldn't do as well, and asked what she wanted. I said to her, 'Get out,' I says, 'Get out, Mother, and stay with us,' I says, 'The baby isn't well nohow.' She says, 'No, I aint going to stay with you any more.' I told her, I says, 'Mother, I would give anything in this world if you just would come back and stay with us and let us live as happy as we possibly can.' She says, 'You can live any-where you want to, or any way you want to, but I am not coming back to you any more.' Then I asked her about going to Cordele, and she said, yes, she wanted to go to Cordele to see Brother Walters; he was over there running a meeting somewhere over near Cordele, but she didn't say she was going; she said she didn't know about that. I told her, I says, 'I want you to get out, and I don't mean may be,' I says, 'Get out and stay with us.' I says, 'We need you and your attention.' She told Mr. Hardwick to drive on, and as he started off I stepped into the car, and when I stepped into the car I was hit with a spark-plug wrench, and here is the sign of it. You all know what a spark-plug wrench is,

I reckon; you could kill a man with it if you get a good square lick at him, and I throwed this hand just naturally up, and that thumb nail was discolored, and it aint come off, but it is coming off, there aint no doubt about that. Well, I didn't think that anybody else was going to interfere at all, and I taken the wrench away from her and threw it out of the car. If I had known that Mr. Hardwick was going to try to take it up, or anything, I would have hit him in the head with the wrench. You all know that I would have done it, him dragging my wife around that way. I would beat him up, and done it before he could have got from under that steering-wheel, even though I was crippled up, and I believe you gentlemen would have done it; and I don't say just you twelve, but any man in the court-house would have done it. A man to drag his wife around that far after he had done forbidden him, I say that any man would have done it, and I believe he would have done it. And when I got that wrench I didn't know anything else that happened. The next thing that I knowed I was standing at a man's house where he had a filling station somewhere, I don't know where, trying to get him to get up some gasoline. That is about the first time that I knowed where I was at, and what was being done. I have been aggravated until I don't know part of the time what I am doing, and sick too. I was in bad shape physically, and every other way."

We have thought it proper to set forth long portions of the statement and portions of the testimony of the daughter and son, to show the state of mind of this defendant and to illustrate the question as to whether or not there was delusional insanity. There is evidence from which the jury might have found that the defendant was jealous of the attentions not only of one man but of two or three. What was the delusion? Was it the delusion under which he labored when he saw or thought he saw Bill Urie talking with his wife and laughing and chatting with her? That can not be the contention. Was it an insane delusion when he concluded that his wife was guilty of acts of infidelity with Urie, if he did so conclude? That could not be inferred. If so, every murder by a jealous man of his suspected spouse could be defended on the ground of delusional insanity. Is the delusion insisted upon to be found in the statement of the prisoner as follows: "On Friday night that my wife was at Mr. Hardwick's I hadn't been sleep-

ing any. I had been watching, and working as hard as a man could for my own satisfaction as to what was the trouble, and the reason I couldn't imagine; and so on Friday night about ten-thirty I was near Mr. Hardwick's house. Of course I wasn't bothering nobody, but I was there, and Mr. Hardwick come out of his room, where his wife was I suppose, on the north end of his house, and come around on the back side of the house and went in at the end window, in the room where my wife was, and I eased up to the window after he had got there—you can go and look at the window, and that wire had been pulled down for some cause; I don't know why, but it was down; and I looked at him when he went in at that window, and he stayed about an hour and a half by my watch, and he come out; and after that, about thirty minutes after he come out, he went up the street to Mr. Huey's house. I suppose him and Huey had made it up and got everything arranged, and Mr. Huey went in at the same window, and he come out in about one hour later. On Saturday night at one o'clock Mr. Hardwick went back in at the same window. I watched them two men, and I seen everything that a man could possibly see. I was standing at the window of the room about twelve by fourteen or sixteen by fourteen, and I was certainly convinced then why it was that I couldn't manage my wife, my family." Which part of his statement was a delusion? Was his conclusion a delusion, or was the fact of the entrance of the man Hardwick and another man into his wife's room the delusion? The defendant makes a statement of fact incriminating his wife. The State insists that that statement is not true, and the defendant's counsel also admit that it is not true. That does not establish delusional insanity or tend to, unless there was evidence showing that there was delusion upon this subject. The accused simply stated what was not true. Suppose that A was indicted and upon trial for the murder of B, and the prisoner should state that he did shoot B but that it was in self-defense, that he met B in the road with C, his brother, and that B immediately drew a pistol, presented it, and fired it at him, and that C, the brother of B, was at the same time attempting to stab him in the back; and suppose it should be overwhelmingly proved that all of these statements of the prisoner were false; that as a matter of fact he had cherished ill feelings towards B; and that when he met B and his brother C in the

road, without provocation he drew his pistol and shot B dead; and that his statement in regard to the circumstances under which the homicide occurred was pure fabrication. Would a court be compelled, under this statement made by the prisoner, to charge a request upon the subject of delusional insanity? We hardly think so, in the absence of evidence that he was laboring under the delusion that B was about to attack him and kill him, and that he could not escape except by slaying B. So we think here; that there is no evidence of any delusion that amounted to delusional insanity, nor is there any such proof of delusion or delusional insanity on the part of the prisoner as to require the court to give the charge in question.

We have pretermitted what might be urged in reply to the contention that the court erred in not giving the charge requested, by saying that the particular delusion insisted upon is not shown; or a principle which has been recognized, that if the delusion is as to a fact which would not excuse the act with which the prisoner is charged, the delusion does not authorize an acquittal of the defendant. Besides, there is a defect in this request to charge, in that it omits reference to the connection between the delusion claimed and the crime committed; and that must be shown, and it must appear that the relation of cause and effect exists between the delusion and the act committed.

5-15. It is unnecessary to elaborate upon the rulings made in headnotes five to fifteen, inclusive.

16. Exception is taken to the following charge of the court: "Under our system of government, in the trial of criminal cases a jury of the vicinage, of the county in which the crime is alleged to have been committed, are empaneled for the purpose of sitting in solemn judgment to ascertain and determine upon a verdict— the word verdict meaning the truth—as to what should be a proper determination and ending of the case. Our law provides that the jury commissioners of each county are appointed in the way provided by law, and that of a certain percentage of the citizenship of the county subject to jury service jurors' names are placed in the jury-box, and from time to time drawn therefrom by the presiding judge, in company with the sheriff and the clerk. Those jurors' names are placed in the jury-box by reason of their uprightness, their intelligence, and their experience, and they

are brought into court at each term for the purpose of trying the grave issues of fact arising during the progress of the court in their county. From that number a certain number of jurors called a panel are placed upon a list for the selection of a jury of twelve in the manner provided by law. That jury of twelve are to hear the evidence and the principles of law involved, and then retire to their room to consider the case, and ascertain the truth thereof. There is no more important duty that can come to man than that of jury service. On the one hand is the interest of society, the commonwealth, or what we are pleased to call the State; the entire body of the people and their interests are involved. You will observe, gentlemen, that the bill of indictment in this case, as in all other criminal cases where bills of indictment are returned, concludes with the formal wording and alleges that a certain thing was done contrary to the laws of this State, the good order, peace, and dignity thereof. On the other hand, the life and liberty of the individual is at stake. No more important duty, I repeat, falls to the lot of man, or mortal man, than that of being called upon to sit in final and solemn judgment, guided by their consciences, and the laws of their State, doing equal and exact justice between man and society; and so I beseech you, gentlemen of the jury, in approaching the final stage of this case, when you have entered your jury-room, I beseech you to look to the evidence in this case,—and when I say evidence I mean the defendant's statement also, giving to it such weight and credit as you think it is entitled to. Let the evidence in this case be your pillar of fire by night and your pillar of cloud by day. Look to and listen at the voice of the evidence and the voice of the law as the things that should control you in the determination of the case. If things have been said to you at some time before you have entered upon the solemn duties, if rumors have come to you of this, that, and the other, if figures or voices should protrude themselves to you that do not come from the evidence in the case, I beseech you again to put them aside and consider the case, consider what is the truth of the case. With the effect of your verdict you are not at all concerned." This is excepted to upon the following grounds: (a) Because it was irrelevant and did not cover any issues involved in said case. (b) Because it did not cover any theory raised by the State or

the defendant in said case. (c) Because it was applicable to no issues raised in the trial. (d) Because it impressed upon the jury the fact that the State and society were interested in the defendant's guilt, and thereby would necessarily prejudice the minds of the jury against this defendant. (e) Because it charged the jury, "If rumors have come to you of this, that, and the other, if figures or voices should protrude themselves to you, that do not come from the evidence in the case, I beseech you again to put them aside," and did not explain to the jury what figures or voices the court had reference to; and because said part of said charge was obscure, unintelligible; and because it was impossible for the jury to tell what voices and what figures the court meant might protrude themselves; and because it would be impossible for the jury to know what the court was instructing them not to consider.

The charge was not error requiring the grant of a new trial, upon any of the reasons urged. It was intended, no doubt, to impress upon the jury the solemn character of the duties and responsibilities resting upon them. It called attention to the important duty resting upon men serving as jurors in the trial of a case like this. It did call attention to the interest of society and of the State and of the entire body of the people; but it also was calculated to impress them with the solemnity of their responsibilities when sitting in final and solemn judgment upon the life and liberty of an accused man, and was calculated to impress them with the duty of "doing equal and exact justice between man and society;" and it called upon the jury in the discharge of their duty to "look to the evidence in the case;" and the court then explained that when he used the word "evidence" he included the defendant's statement, and urged upon the jury to give it such weight and credit as they thought it was entitled to. Where the court deals with a subject like that dealt with in this portion of the charge, the charge is prophylactic in nature, as has been said. The trial court is not bound in the course of his instructions to make an appeal to jurors to do entire justice and to impartially decide the issues involved in the trial of the case; but when he sees proper to do so, it does not constitute error upon which this court would be authorized to grant a new trial.

       *Judgment affirmed. All the Justices concur.*