## 24646. McKINNON v. THE STATE.

DECIDED JULY 22, 1935.

*W. G. Warnell, E. J. Goodwin,* for plaintiff in error.
*Samuel A. Cann, solicitor-general, Andrew J. Ryan Jr.,* contra.

MACINTYRE, J. The indictment charges that on May 16, 1934, in Chatham county, Georgia, Charles W. McKinnon committed the offense of assault with intent to murder by shooting J. M. Hopkinson with a shotgun. The jury found the defendant guilty of the offense charged. His motion for a new trial being overruled, he excepted.

The first special ground of the motion for a new trial avers that the court committed error in failing "to charge [without request] the law of "shooting at another," as contained in section 26-1702

of the Code of 1933. The other special ground complains that the court "erred in failing to charge the law of delusional insanity," there being no request that he do so.

We deem the following a sufficient statement of the facts of the case which are material to a decision of the questions raised by the two special grounds. J. M. Hopkinson was for many years superintendent of motive power of the S. & A. Railroad, and Charles W. McKinnon was an employee of that corporation for a longer period. In October, 1933, it was reported to Hopkinson that the defendant had been "drunk on the job." Hopkinson did not smell any whisky on McKinnon, but McKinnon appeared to be in a "stupor." Hopkinson told McKinnon that if he caught him drunk, McKinnon would lose his job. McKinnon said that he was not drunk, but that he had been sick and was not able to work on the job he had. Hopkinson put the defendant to work at a lighter job in Savannah. It was again reported to Hopkinson that the defendant "was drunk on the job." The defendant appeared to be in a stupor, but there was no odor of whisky about him, and Hopkinson ordered that the defendant be not discharged if he was not drunk. On the same day the defendant reported to Hopkinson that one Phillips had discharged him because of alleged drunkenness, but that he was not drunk—that "they put him in jail, and . . he got a bondsman and got out." The defendant wanted Hopkinson to "send him a month's pay," which was done. A few days later the defendant called Hopkinson over the telephone and asked if he were going to put him back on the job, and Hopkinson told him that he was not. The defendant then told Hopkinson that he put him in "the same class with Phillips, the dirty lowdown crook, on account of hiring such men as that." Prior to the shooting, the defendant told Hopkinson several times that he was "going to make him suffer." The shooting occurred on May 16, 1934, after Hopkinson had driven to his home in his automobile and had gotten out of the car. Hopkinson testified: "I had put the lights out . . , and walked back to the car when I heard a gun fire, and I thought it was an automobile tire blow out. I turned my head and the gun fired again and hit me in the head. It was a shotgun, and I knew somebody was shooting at me, and I thought 'McKinnon.' I dropped behind the spare wheel, and three shots were fired, and the scars are on the left corner of the car about

three inches above my head. I did not see McKinnon, as he was in the dark and I was in the light. . . I was holding on to the spare wheel on the car . . , and blood ran all over my head, face, and chest." When confronted with Hopkinson after his arrest, the defendant said: "I intended to do it; if you are not hurt it is not my fault, you two-faced s. o. b." Hopkinson further swore: "I did not see the gun; he was in the bushes in the dark. McKinnon had a gun and a pistol. The first shot was [from] a shotgun, and then there was an intermission between one and two. The second shot hit me. Then I heard the pistol shots. . . I did not consider him an insane man during the years that he worked with me. He always had a very apt mind—was above the average for a car-repairer. He was hard to handle. Would fly off the handle when you would talk to him about his work. When you would tell him if he didn't carry out instructions, that somebody else would be put on the job, he would change. He must be around fifty-eight or fifty-nine years old." The defendant's wife deserted him in 1920, leaving with him a young daughter.

J. D. Harley, an employee of the same railroad for which the defendant was working, testified in part: "I was there when the officers came. McKinnon said that was the old man, and if he wasn't hurt it was no fault of his, 'the two-faced s. o. b.' . . I have had the opportunity to observe McKinnon about twelve years. I would say the man was sane."

Ernest B. Scott testified in part: "He [the defendant] seemed sore about being discharged. He said he was going to get Mr. Hopkinson and Mr. Harley and Mr. Phillips before he left. . . I don't know, or can't say, that he was sane or not at the time he shot Mr. Hopkinson."

Arthur W. Phillips, another employee of the same railroad for which the defendant worked, testified in part: "I saw him [defendant] again on the morning of May 16th. He made a statement about 'look at it, it is the old man. If you are not hurt it is no fault of mine, you two-faced s. o. b.' . . That was after the shooting. . . Yes, he was talking about Mr. Hopkinson. He looked the same as he always did, . . his work was efficient. He appeared sane."

Ralph E. Woods testified in part: "Yes, I saw McKinnon. He came to my place. It was about two o'clock in the morning. . .

He told me to get up, that he was in trouble. He said that he had killed . . Hopkinson. . . He said he shot him twice, . . was satisfied the man was dead. He said he shot him once and he did not fall, so he shot him the second time and he fell. . . McKinnon showed us a pine tree where he put the gun. The officers got the gun and we went to Mr. Hopkinson's and McKinnon said: 'There is the old man. If he is not hurt, it is not my fault, you two-faced s. o. b.' Yes, this is the gun, I am positive it is."

D. H. Mobley testified in part: "Yes, it was early in the morning when I saw McKinnon. It was about 2:15. He woke me up and told me he wanted to use the telephone, that he was in trouble, . . said he killed the superintendent of the S. & A. Railroad. . . He said he shot him with a double-barrel shotgun with buckshot, and wanted me to call the sheriff. . . I have known the defendant about seven years. Yes, he did business with me, and he appeared sane. . . I knew him to be a peaceable citizen up to that time."

Dr. L. T. Waters testified that he was called to see Hopkinson on May 16th, and found that he had been shot in the head with a shotgun. The witness further swore: "I have known him [McKinnon] about ten years. I have treated him off and on ever since I knew him. . . From my observation of him, I would say that he was sane. Yes, I saw him the morning Hopkinson was shot. I could say he was sane."

Dr. L. B. Dunn testified in part: "I am a member of the lunacy commission of Chatham county. Yes, I investigated the sanity of McKinnon. . . It was the unanimous opinion of the lunacy commission that he was sane at that time. . . I could not say whether he was sane or insane prior to the investigation."

Dr. L. T. Waters, recalled by the State, testified: "I treated McKinnon for colic trouble, bilious attacks, and would see him a few times after a drunk."

D. T. Downing testified in part as follows: "Yes, he [defendant] made a statement . . at the time of his arrest. When I walked up to him he asked me if he killed the man. I said: 'You did not.' He said . . he ought to have killed him, 'the s. o. b.;' that he shot at him twice with a double-barrel shotgun loaded with buckshot. He told us that he hid the gun by a pine tree. We found the gun where he said he hid it." Here the State rested.

John G. Miller, sworn for the defendant, testified in part as follows: "I am special bailiff. . . It was around June 4th. I went down to see him [defendant] and the other prisoners, to see if he wanted a lawyer. He did not look normal to me. He had an excited look. . . He said . . he had [a lawyer?] to tell his friend Bill Grayson to come and see him. I could not tell whether he was sane or insane. He looked just like a man over a drunk. I guess he had been in jail fifteen days."

At this time the State introduced Dr. G. H. Johnson, who swore that he was on the lunacy commission that found the defendant sane; that he had never seen the defendant prior to that time; and that he could not say whether he was sane or insane in May of this year.

Nathan Cohen, a policeman, could not say "whether this man was demented or not." W. L. Edgely swore that he had known the defendant about ten years, and that he was "always a law-abiding citizen." J. C. Lewis testified that the defendant bought an automobile from him, and "always looked normal," and that he had never "heard of him being in any trouble."

F. M. Oliver testified in part: "I am a practicing attorney in Savannah. I think the first time I saw McKinnon was last summer . . I would not say he was a normal man. I thought he was a very peculiar man. . . From what I saw of him last summer when the Juvenile Court thought necessary to take charge of his girl . . , I thought what the Juvenile Court wanted to do was the proper thing. . . He purchased a place . . known formerly as Cutting's barbecue stand, and he claimed . . that his little girl was not exposed to . . improper influences, but my investigation led me to believe that the atmosphere . . , if not the actual practices, that she would be brought in contact with, were not proper for that child. I had him agree . . that he would pay certain expenses for the boarding of the child in school, and it seemed . . everything was amicable, and, to my utter astonishment, one day . . he suddenly announced he was not going to do it. The result was he finally did co-operate. . . It struck me at the time he was certainly very peculiar. . . I saw him after that . . , and I found that he had a grudge against Mr. Hopkinson, . . it was a very decided grudge . . , and the inquiries I made convinced me that he had no reason for a

grudge against Mr. Hopkinson, that Mr. Hopkinson had been most forbearing and considerate. . . I was called to the jail. . . He was not normal. I never saw a man more callous about a thing. He told me about shooting Mr. Hopkinson as if he were shooting a chicken. I thought he was one of the meanest men I ever saw or he was a paranoiac, in other words, that he had delusional insanity. He had the idea that Hopkinson was an enemy of his and it was necessary for him to do what he did. . . Yes, I represented him on the preliminary hearing, and also testified before the lunacy commission."

E. J. Goodwin testified in part: "When I was appointed on this case, I endeavored to consult with the defendant . . , and was unable to get any intelligent statement from him. . . Mr. Mc-Kinnon blurted out to me: 'Who in the hell sent you down here? . . I don't want any damn lawyer.' . . The man did not appear to be normal. . . He had a wild look in his eyes. I thought the only thing I could do was to swear out a lunacy warrant, which I did. The only time I was able to get any statement out of this defendant was on yesterday. . . He did have a wild look in his eyes, did not act normal, and I was greatly handicapped in preparing the man's defense."

The defendant's statement was: "All I can say is I remember very little about it right now. It is all mixed up to me. I hardly know what it is all about. . . I can't remember."

F. M. Oliver, recalled by the State, testified in part: "I am under subpœna. . . I did undertake to represent the man originally, but his family would not raise a fee to pay me, and I withdrew from the case. . . He wanted to employ me and could not raise the money—at least did not raise the money . . , and I withdrew."

As already stated, the first special ground avers that the court committed error in failing to charge the law applicable to the crime of shooting at another not in his own defense. "A verdict of shooting at another is not a legal finding, where the evidence demands the conclusion that the defendant was either guilty of assault with intent to murder or was not guilty at all." *Fallon* v. *State,* 5 *Ga. App.* 659, 661 (63 S. E. 806), and cit. If the defendant were capable of forming an intent, there can be no question that it was lethal. Under the evidence in the case, the jury could have ren-

dered but one of two verdicts—guilty of assault with intent to murder, or not guilty for the reason that the defendant was not responsible for his act. There was no middle ground, and the court did not err in failing to charge the law applicable to the offense of shooting at another not in his own defense. This question is controlled in principle by the ruling in the case of *Kendrick* v. *State,* 113 *Ga.* 759 (39 S. E. 286).

Did the court commit reversible error in failing, without request, to charge upon delusional insanity? "If a man has reason sufficient to distinguish between right and wrong in relation to a particular act about to be committed, he is criminally responsible. An exception to this rule, however, is, where a man has reason sufficient to distinguish between right and wrong as to a particular act about to be committed, yet in consequence of *some delusion,* the will is overmastered and there is no criminal intent. Provided the act itself is *connected with* the peculiar delusion under which the prisoner is labouring." *Roberts* v. *State,* 3 *Ga.* 310 (3). This rule has been consistently followed by the Supreme Court of this State. "A delusion may be defined as an absurd and unfounded belief." 3 Witthaus & Becker's Medical Jurisprudence, 177. See *Mars* v. *State,* 163 *Ga.* 43 (135 S. E. 410), where the Supreme Court applied the substance of the above definition to the facts of the case and reached the conclusion that the defendant did not kill under a delusion, that delusional insanity was not in the case, and that the court did not err in refusing to give the jury a requested charge upon that subject. It appears in the instant case that the defendant had a "decided grudge" against Hopkinson because of the belief that Hopkinson had ordered him to be discharged and because Hopkinson had refused to hire him again, and that the shooting arose out of this "grudge." The belief that Hopkinson was instrumental in bringing about the defendant's discharge was not a delusion. It was supported by the acts and words of Hopkinson. Hopkinson told the defendant in so many words that he was not going to put him back on his job. The defendant's belief that he had been greatly wronged by Hopkinson was no doubt incorrect; but there were facts to sustain it—facts, which it is easy to conceive, appeared sufficient to an old employee who appears to have been high-tempered, hard to control, and addicted to drink. We are not unmindful of the following testimony of the witness

Oliver: "I thought he was one of the meanest men I ever saw or he was a man who was a paranoiac, in other words that he had delusional insanity." The witness was a lawyer who had known the defendant only since "last summer," and was not an expert on insanity, and, testing his rather equivocal conclusion that the defendant had delusional insanity by the facts upon which it was based, we do not think that the facts support the conclusion.

But even if it should be conceded that the defendant acted under a delusion, we are still confronted with the rule that "If the defendant insanely believed something which, were it true, would not legally justify the act,—as, in the language of the English judges, 'if his delusion was that the deceased had inflicted a serious injury to his character and fortune, and he killed him in revenge for such supposed injury,' he would be liable to punishment." This rule, which is quoted in *Taylor* v. *State*, 105 Ga. 746, 779 (31 S. E. 764), is taken from 1 Bish. Cr. Law, § 393. In the *Mars* case, supra, the Supreme Court recognizes that "if the delusion is as to a fact which would not excuse the act with which the prisoner is charged, the delusion does not authorize an acquittal of the defendant." We call especial attention to the facts of the *Mars* case, the reasoning of the court (page 58 et seq.) to show that there was no delusion, and the wealth of authorities cited therein. Under the facts of the instant case, the defendant could not have been properly acquitted because of "delusional insanity," and the court did not err in failing, without request, to charge the law upon that subject.

The evidence warranted the jury in finding that the defendant was sane when he committed the act charged, and that he shot Hopkinson with the intent to kill him. It follows that the evidence supports the verdict, and that there is no merit in the general grounds of the motion for a new trial.

*Judgment affirmed. Broyles, C. J., and Guerry, J., concur.*